UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 14-60166-Civ-SCOLA/OTAZO-REYES

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

ACQUINITY INTERACTIVE, LLC, *et al.*,

      Defendants.

**PLAINTIFF'S MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANT BURTON KATZ AND TWELVE BUSINESS ENTITIES SHOULD NOT BE HELD IN CONTEMPT AND MEMORANDUM IN SUPPORT**

Burton Katz runs a sprawling online scheme that deceives consumers into providing money and their personal information. His companies' websites lure consumers by promising a quick and easy government service (*e.g.*, renewing a driver's license or obtaining a fishing license) or eligibility determinations for public benefits (*e.g.*, Section 8 housing vouchers or food stamps). Consumers provide their information based on the scheme's promise to provide these services. Instead, consumers receive only a PDF containing publicly available, general information about the service they sought. [1]

Katz's actions blatantly violate the 2014 stipulated order in this case. Specifically, this Court prohibited Katz from making misrepresentations in the marketing or sale of any goods or services to consumers, Stipulated Final Judgment and Order for Permanent Injunction ("Permanent Injunction" or "Order") (Dkt. 132) entered on October 16, 2014, yet Katz continued to represent that he would deliver services that he never provided. Accordingly, Plaintiff Federal Trade Commission ("FTC" or "Commission") moves for an order to show cause why Defendant

---

[1] The FTC also filed a *de novo* complaint against Katz, the businesses named in this motion, and other businesses and individuals involved in the deceptive activity. *See FTC v. On Point Global, LLC, et al.*, Case No. 19-CV-25046-SCOLA (Dkt. 1). A draft of this motion was lodged in that case as an attachment to the FTC's notice of related case. *Id.* (Dkt. 5).

Burton Katz and 12 companies[2] of which he is an officer or agent should not be held in contempt.

## I.    BACKGROUND

In its 2014 Complaint, the FTC alleged that Katz engaged in deceptive and unfair cramming on mobile phone bills.  Amended Compl. (Dkt. 88, June 16, 2014).  Katz and his operation tricked consumers into signing up for costly phone bill subscriptions through websites that offered free merchandise in exchange for consumers' phone numbers.  Amended Compl. ¶44.  Katz's operation then enrolled the consumers in unwanted premium text messaging services that charged them monthly, typically for $9.99.  The only mention of the charges appeared in separate hyperlinked pages or in small print and locations where consumers were unlikely to notice it.  Amended Compl. ¶¶45-47.

To resolve the matter, Katz stipulated to the Order.  Order at 14.  It prohibited Katz from, among other things, "making, or assisting others in making, expressly or by implication, any false or misleading representation including representations concerning the cost, performance, efficacy, nature, characteristics, benefits, or safety of any product or service, or concerning any consumer's obligation to pay for charges for any product or service."  Order at 2.  The Order also subjects Katz to ongoing compliance monitoring.  Order at 7-12.

Despite these restrictions, Katz continues to operate deceptive businesses,[3] as detailed below.  As in his prior scheme, he uses deceptive websites to lure consumers into giving up money and personal information.[4]

---

[2] The companies (collectively, "Corporate Contempt Defendants") are:  On Point Global LLC, On Point Employment LLC, and On Point Guides LLC f/k/a Rogue Media Services LLC (collectively, "On Point"); Dragon Global LLC, Dragon Global Management LLC, and Dragon Global Holdings LLC (collectively, "Dragon Global"); Waltham Technologies LLC; Cambridge Media Series LLC f/k/a License America Media Series LLC; Issue Based Media LLC; DG DMV LLC; Direct Market LLC; and Bronco Family Holdings LP a/k/a Bronco Holdings Family LP.

[3] In the FTC's *de novo* case (*see* n.1 *supra*), the Court appointed a receiver.  *See FTC v. On Point Global, LLC, et al.*, Case No. 19-CV-25046-SCOLA, TRO and Preliminary Injunction (Dkts. 17, 126).  This motion therefore reflects the Contempt Defendants' activities up to December 16, 2019, when the TRO appointing the receiver was served; since service of the TRO, the receiver has taken over the businesses' and websites' operations and uncovered additional websites.  *See id.*, Receiver's Report (Dkt. No. 108).

[4] In addition, Katz violated the Order's compliance monitoring provisions, which required him to submit a sworn report of all of his business activities and any businesses he owned.  PX13; Order at 8-9.  Katz failed to fully disclose his ownership interests and business activities, and falsely

## II.     STATEMENT OF FACTS

### A.     Parties to the Current Action:  Contempt Defendants

Burton Katz is the architect and leader of the online scheme.  He is CEO, owner, partner, or manager of the Corporate Contempt Defendants.  PX1 ¶143, Atts. E p.5, G p.2, AT p.13, AU p.16-17, BA p.3, BB; PX12 Att. C pp.7, 23, 42, 46, 48, 69, 70-74, 102, 107-08, 115, 125, 132, 144, 147-48, 151-53; PX13 p.2.  Specifically, Katz is the CEO of On Point, his operation's umbrella company and hiring department, and one of three venture partners in Dragon Global, its capital-raising arm.  PX1 Atts. E pp.5, 11-12, 22, 24-25, G pp.2, 6, AP.  His LinkedIn profile describes him as an "Internet Entrepreneur" who leads Waltham Technologies, which handles the operation's payroll.  PX1 Att. AU p.16-17; PX4 ¶13.  In addition, bank documents list Katz as "Key Executive" or "Owner" with "Control of the Entity" for DG DMV, Cambridge Media, and Issue Based Media (PX12 Att. F pp.32, 55, 79); these entities hold domain names, rented mailboxes, leases, and central bank accounts.  PX4 ¶12; PX9 and attachments; PX12 Att. C pp.17-22, 35-40; PX13 p.2.  Katz is the largest shareholder in Direct Market, which touts its abilities in "online marketing" and "building online audiences."  PX1 Att. AR; PX12 Att. C pp.46-48.  As On Point's CEO, Katz also controls entities that hold the scheme's merchant processing accounts, website portfolio, and revenues in a nested labyrinth of LLCs and bank accounts.[5]  Katz's employees' names are on corporate papers for many of these entities,[6] and

___

claimed that he did not hold any operational, executive officer, manager, or employee positions with any but the three companies he named, and that he was not involved in the marketing of any products other than practice driving tests through DMV.com.  PX13 pp.2-3.  In fact, Katz and On Point Global began operating the driver's license websites as early as 2011 (PX1 Atts. AU p.67, AX p.2, BG pp.1-7), and Katz owned and/or managed several other entities at the time.  PX1 Atts. BA p.18 (Cambridge Media 2013), BB (Cambridge Media/License America Series 2011); PX8 pp.104, 106-107 (License America Holdings 2014), 107-108 (Blackbird Media 2014); PX11 Atts. B pp.24-25, 84-85, 97-98 (Falcon Media 2014), E pp.7-10 (Falcon Media and Matzoh Media 2015).

[5] The additional entities are defendants in the FTC's recently filed complaint in *FTC v. On Point Global LLC, et al*.  They are:  Bluebird Media LLC; Borat Media LLC; Bring Back the Magic Media LLC; Chametz Media LLC; Chelsea Media LLC; Coinstar Media LLC; Domain Development Studios LLC; Domain Dividends Media LLC; Eagle Media LLC; Falcon Media LLC; GNR Media LLC; Island Media LLC; Leatherback Media Group LLC; Macau Media LLC; CEG Media LLC f/k/a Matzoh Media LLC; MBL Media; Orange and Blue Media LLC; Orange Grove Media LLC; Panther Media LLC; Pirate Media LLC; Pivot Media Group LLC; PJ Groove Media LLC; Sandman Media Group LLC; Shadow Media LLC; Skylar Media LLC; Slayer Billing LLC; Spartacus Media LLC; Very Busy Media LLC; Wasabi Media LLC;

they applied for the entities' merchant processing accounts[7] and administer its website portfolio.[8] *Compare* PX1 Atts. E p.5 (On Point leadership), AR (Direct Market leadership), AU (employee LinkedIn pages) *with* PX1 Att. BB (corporate chart), PX11 (merchant accounts). Finally, Katz received more than $2.5 million of the operation's proceeds, both directly and through his holding company, Bronco Holdings, PX1 ¶191; *see also* PX13 p.2, a Bahamian corporation that holds bank accounts in Switzerland and Nevis, as well as Katz's interest in On Point Global LLC and his other companies. PX1 ¶191 (money transfers), Att. BA p.16 (On Point membership); PX8 pp.99-184; PX12 Att. C pp.24, 48, 70-71, 115; PX13 pp. 1-2.

Katz has led the scheme's deceptive marketing since its inception. A third-party website containing Katz's biography states that Katz "started OnPoint in 2011 at a table in Starbucks." PX1 Att. AX p.2. Indeed, in 2011, he exchanged emails with associates about the design of a "driver's license form" and "DriversLicenses.org," discussing changes he wanted the designers

Yamazaki Media LLC; Bella Vista Media Ltd. d/b/a BV Media; Carganet S.A. d/b/a G8 Labs; On Point Domains LLC; Final Draft Media LLC; Blackbird Media LLC; License America Holdings LLC; and License America Management LLC.

[6] For example, Charles Ohana, an OnPoint software engineer, is on Borat Media's organization papers (PX1 Atts. AU pp.31-34, BB p.1); Tehilla Drori, office manager, is on Island Media's papers (PX10 Att. B p.1; PX12 Att. C pp.86-88); Candice Nestel, OnPoint's "site manager" and "director of vertical markets," is on papers for Very Busy Media (PX1 Atts. AU pp.1-2, 5, 11, BB p.3); Gabriel Penaloza, OnPoint's director of finance, is on Shadow Media's papers (PX1 Atts. AU pp.35-36, BB p.3); Brent Levison, OnPoint's general counsel and CAO, is on corporate documents for Chametz Media, Chelsea Media, Eagle Media, MBL Media, and Bring Back the Magic Media (PX1 Atts. AU pp.13-14, BB pp.1-2; PX12 Att. C pp.27-29, 76-78); Arlene Mahon, OnPoint's and Waltham's senior vice president of finance, is on PJ Groove Media's papers (PX1 Atts. AU p.15, BB; PX12 Att. C pp.135-137); Christopher Sherman, OnPoint's director of data processing and Direct Market team member, is on papers for Pirate Media and GNR Media (PX1 Atts. AR, AU p.44, BB p.2; PX11 Att. B p.83; PX12 Att. C pp.81-83); and Elisha Rothman, also a director of data processing and Direct Market team member, is on papers for Yamazaki Media (PX1 Atts. AR, AU p.39; PX11 Att. E p.6).

[7] For example, Christopher Sherman sought merchant accounts for GNR Media and Pirate Media; Charles Ohana for Borat Media; Candice Nestel for Very Busy Media; Brent Levison for Chelsea Media, Eagle Media, MBL Media, and Bring Back the Magic Media; Gabriel Penaloza for Shadow Media; Arlene Mahon for PJ Groove Media and Cambridge Media Series; Elisha Rothman for Orange Grove Media and Yamazaki Media. PX11 and attachments. Additionally, Katz himself sought accounts for Falcon Media and CEG Media (f/k/a Matzoh Media).

[8] For example, On Point VP of Finance Arlene Mahon is listed on 200 website domain records; general counsel and CAO Brent Levison on 177; and director of data processing Chris Sherman on 85. PX1 ¶180, Atts. E p.5, AU pp. 13-14, 28, 44.

to make to the websites.  PX1 Att. BG pp.2, 5-7.  Tellingly, on one email chain, an associate told Katz, "I eliminated the questions about child support.  Why?  I believe if someone is filling out this info under the auspices or belief of getting his or her license, the child support could cause them to abandon the registration process.  Who wants to admit to being in trouble when all they want is a license?"  PX1 Att. BG p.2.  The exchange demonstrates that Katz and his partners not only knew their sites misled consumers, as detailed below, but intentionally designed them to do so.

Furthermore, Katz's social media presence demonstrates his ongoing control of the scheme's activities.  For instance, in January 2019, On Point Global's Facebook account posted a picture of Katz with the caption "Happy birthday to our fearless leader @burtonkatzmiami." PX1 Att. AW p.3.

**B.      Contempt Defendants' Violative Business Practices**

Katz and his operation, including the Corporate Contempt Defendants, operate hundreds of sites employing similar branding, language, and functionality to induce consumers to relinquish their credit-card information, personal data, or both.  PX1 Atts. B, C, H, AZ, D p.1 (Katz has "developed, managed and operated over 200 websites"), BH.  Their sites fall into two categories:  those offering state licensing or motor-vehicle services, and those offering assistance with public benefits.  PX1 ¶¶18-25, Att. BH.

**1.      Contempt Defendants' State Licensing and Motor Vehicle Websites Do Not Provide the Services They Promise**

Contempt Defendants and their employees and subsidiaries use search-engine advertising and optimization to target consumers who search for state motor vehicle or licensing services. PX1 ¶¶42-43, 79-80; PX14 ¶2; PX15 ¶¶2-3; PX16 ¶¶2-3; PX17 ¶¶2-3; PX11 Att. C p.19 (DMV.com document stating, "Our web traffic is predominantly generated through search and email marketing campaigns, meaning users typically find our website via search engines (e.g. Bing)").  For example, an FTC investigator searched "renew Florida drivers license online" in March 2019, and Katz's websites appeared as the second result.  PX1 ¶42, Att. M.  The scheme's sites appear in search results with URLs like californiadrivers.org, floridadriverslicenses.org, and indianadriverslicense.org.  PX1 ¶20, Att. BH p.9.  They generally include a state name and some variant of "driver" or "drivers license," and many end in ".org."  *Id*.  These sites have an image of the state's border and the text "Your source for [state] driver's information" and do not

conduct the transaction sought; they only receive clicks from search ads and SEO, then redirect traffic to sites that accept payment.  PX1 Atts. C, M, BH.

Contempt Defendants also operate DMV.com, which offers links for driver's services in all 50 states and presents itself as a clearinghouse for many DMV-related services, from licensing to driving records, under the heading "Online DMV Services."  PX1 Att. A.  The site's prominent home-page banner promises "The DMV Made Easier" and features links to "Renew your License," "Renew Car Registration," and more.  PX1 Att. A p.1.  DMV.com's Facebook page is even more explicit, claiming "you can renew you [sic] driver licenses online here!! Skip the lines doing it from you [sic] home" and linking to "dmv.com/drivers-license-renewal," and using the hashtag "#SkipTheLine" while linking to DMV.com.  PX1 Att. AW pp.1-2.  When an FTC investigator clicked "Renew your License," she reached a page with a large "Get Started Online with Drivers [sic] License Renewal Assistance" hyperlink and a block of text stating, "In most states, you can renew your drivers [sic] license online, by mail or in person … During an online license renewal, you will be asked to identify yourself and pay the applicable service fees."  PX1 ¶28, Att. I; *see also* PX1 Att. A p.13.

Whether from a state-specific site or DMV.com, clicking a link, like the "Get Started Online" link described above, leads consumers to a site where Katz's companies gather consumers' information.  PX1 ¶¶28-29, 42-43, 54, Atts. J pp.1-4, N pp.1-4, Q pp.1-3.  These include, for example, license-driver.com, licenseguides.org, and registrationtags.com.[9]  *Id*.  The sites have a bold-font headline reading, for example, "Renew Drivers [sic] License In Your State," and orange text touting, "GET ALL THE INFORMATION TO COMPLETE THE PROCESS NOW."  PX1 Atts. B, J p.1, N p.1, Q p.3.  Clicking through leads to a page listing services next to check-boxes, including "New Driver's License," "Replace Driver's License," and more; one box is pre-checked depending on which service was selected on prior pages.  PX1 ¶¶31, 44, Atts. J p.2, N p.2.  The sites include forms for consumers to fill in their contact information and credit-card number.  PX 1 Atts. J pp.1-2, 4, N pp.1-2, 4, Q pp.3, 7, 10.

Once consumers pay, they either receive a PDF entitled "[State] Drivers License Guide," which includes general information about state vehicle services and safe-driving tips, or nothing

---

[9] It appears Contempt Defendants use only one template for these "transaction" sites; in three investigative purchases on motor-vehicle sites, the transaction sites used identical wording and branding, and captures of the home pages of additional transactions sites show the same format. *Compare* PX1 Atts. J, N, Q; *see also* PX1 ¶19, Att. B.

at all.  PX1 ¶¶36-38, 48, 60-61, Att. O.  Either way, the sites charge consumers' credit cards a small amount (normally $3.99 or $4.99) on the day of the purchase and a larger amount (normally $19.99 or $21.99) within a few days.  PX1 ¶¶39, 49, 62, Atts. L, P, S; PX14 ¶¶5, 9; PX15 ¶9; *see also* PX17 ¶7.  The sites do not provide the promised license or other motor-vehicle transactions.[10]  PX1 ¶¶40, 50, 63; PX14 ¶¶13-14; PX15 ¶¶7-8; PX16 ¶6.

Unsurprisingly, hundreds of consumers have complained to law enforcement and consumer-protection organizations about the scheme's motor vehicle and licensing websites. PX5 ¶ 24, Att. E p.1.  As of June 25, 2019, the FTC has received 953 complaints that referenced one of the Contempt Defendants, their subsidiaries, or their licensing and motor-vehicle websites.  *Id.*  Most such complaints concerned the motor vehicle sites, though some addressed hunting and fishing license sites.  *Id.*  Consumers complained that the websites misleadingly offered actual state services, and they expected to obtain the selected service – not a guide – when they provided their information.  *Id.*, Att. E p.3; PX14 ¶13 ("I would not have paid $26 for a road guide.  This company is scamming people trying to renew their license."); PX16 Att. A p.2 (consumer's email to company reading, "I was misled to believe your website was a drivers license address change service.  The product I received as [sic] a short few lines of text describing already publicly available knowledge, not the full-service address change as expected.")  To make matters worse, consumers who called Katz's operation seeking refunds under the promised "Money-Back Guarantee" often did not receive a full refund.  PX5 Att. E p.3.  Consistent with these complaints, when the FTC's investigator sought a refund for an undercover purchase, Contempt Defendants offered to refund the $19.99 charge but not the $4.99 "processing fee" – even then, she never received the promised partial refund.  PX1 ¶¶127-133, Atts. AM, AN.  Complaints about Katz's operation's motor vehicle and licensing sites has risen steadily since 2015.  PX5 Att. E p.1.

---

[10] Contempt Defendants' other state licensing sites function similarly to their motor vehicle sites. See PX1 ¶¶78-86, PX17.  Consumers reach the sites after searching for a way to obtain state hunting or fishing licenses and clicking one of Contempt Defendants' links.  PX1 ¶79, Att. Z; PX17 ¶¶2-3.  The sites then promise help obtaining a license (for example, headlines reading "New [state] Fishing License Assistance" and "Skip the Hassle & Start Fishing" on fishinglicense.org).  PX1 ¶80, Att. Z p.2.  The sites do not deliver the promised licenses, instead providing only a PDF with information about fishing skills and fishing licenses.  PX1 ¶86; PX17 ¶11.

These complaints underscore the central offense of the sites:  Contempt Defendants design their sites to make consumers believe they will actually provide a motor-vehicle or licensing service, not just a "guide."  See PX5 Att. E p.3; PX14 ¶6; PX15 ¶5; PX16 ¶4; PX17 ¶4. The sites' fine-print "disclaimers" merely serve as a fig leaf to hide, rather than correct, their misrepresentations.  Indeed, in a letter to a payment processor, Contempt Defendants themselves admitted their "disclaimers" were ineffective, explaining they "place multiple notices explaining to the user that we are [sic] third party site and not affiliated with the government"[11] but they "still encounter confusion from customers."  PX11 Att. C p.19.  For example, the landing pages on the transaction sites appear as follows:



*Licenseguides.org landing page, accessed March 8, 2019*

---

[11] Katz's sites include lines of small-font text outside the main section of the site reading, for instance, "DMV.com is a privately owned website that is not affiliated with any government agencies" or "[URL] is in no way or fashion affiliated with any federal or local governmental agency or offices."  PX1 Atts. J, N.  Even if consumers saw these inconspicuous "disclaimers," they have no bearing on the sites' central promise:  that consumers will receive a government service, regardless of whether it is delivered by the government or a third party.

The block of text above the central highlighted area on the transaction site landing pages begins, "Welcome to licenseguides.org, your comprehensive resource for all you [sic] driver license-related services." Both that text and the text below the central area continue, "The services we provide are available for free in the official sites or local offices. You can purchase for $23.98 and download our comprehensive guide and resources, which contains [sic] vital information in order to perform any DMV service … ." PX1 Atts. J p.1, N p.1. Katz's operation thus buried the only reference to the "guide" in the middle of the block and presents it as if it is an optional upsell ("You can purchase …"), not the sole product the consumer will receive. *Id.*

Similarly, a popup window that appears over the transaction sites' landing pages appears as follows:



*Driverslicenseinfo.org, accessed July 30, 2019*

The text in the pop-up reads,

"**Driving a motor vehicle without a valid driver's license, car registration or car title may be illegal, as is driving with expired credentials.** Motor vehicle services and applications must be processed by an official DMV location/website. The assistance and services on this site simplify the process by providing personalized guides, documents, and live support for a fee. This site store [sic] cookies, by clicking "Accept" you acknowledge the statements above and that this site is privately owned and is not affiliated with nor endorsed by an official agency. **To aid in the task, our detailed website has compiled and lists the most important information surrounding your motor vehicle services, so you can ensure the process is handled in a**

**compliant and timely manner.  Driving a motor vehicle without a valid driver's license, car registration or car title may be illegal, as is driving with expired credentials.**" [12]

PX1 ¶58, Att. Q p.14.  Again, the text sandwiches the only vague reference to "guides" between bold-font, threatening language, and never states that consumers will receive only a guide, not a motor-vehicle transaction. [13]  *Id.*

### a)      Study Confirms Motor Vehicle Sites Mislead Consumers

Expert consumer-perception testing confirms that Katz's motor-vehicle sites deceive a large portion of the consumers who encounter them, and nearly all of the consumers who complete transactions.  PX3 ¶¶88-89, 102-103.  Dr. Michelle Mazurek, a professor of computer science who specializes in an interdisciplinary field combining human-computer interaction and computer security at the University of Maryland, tested one of the motor vehicle transaction paths.  PX3 ¶¶2, 15-18.  She conducted both preliminary in-person studies and larger online studies to determine how consumers understand the sites.  *Id.*  The online study recruited 107 participants, who were directed to role-play as a person who wants to renew a driver's license and asked to interact with Contempt Defendants' websites.  PX3 ¶¶53, 69-70, 85.  The study demonstrates that consumers who encounter Katz's motor vehicle sites – particularly those who completed payment – overwhelmingly believed the site would renew their license, not simply send them a PDF "guide."  PX3 ¶¶88-89, 102-103.  Dr. Mazurek used two sample groups, and 50% of one group and 40% of the other completed the transaction and "paid."  PX3 ¶¶85-86.  Of those who paid, 87.8% of one sample group and 90% of the other believed the sites had actually renewed their driver's licenses.  PX3 ¶88.  Very few participants (6.1% of one sample group and 24% of the other) mentioned the site could not be used for license renewal, was not government-owned, or was generally suspicious.  PX3 ¶92.

Dr. Mazurek's tests also confirmed Katz's sites' fine print is ineffective.  PX3 ¶¶93-99. Many of Dr. Mazurek's test subjects never noticed or read the purported "disclaimers," or read

---

[12] As of March and April 2019, a similar pop-up appeared only when the FTC investigator typed in a transaction site URL directly; no pop-up appeared when she clicked a link from a feeder site.  PX1 ¶¶29, 43.  In July 2019, the investigator visited the car-related transaction sites again and discovered Contempt Defendants had added the pop-up quoted above over the first page regardless of how a consumer reached the site.  PX1 ¶58.

[13] The mobile versions of Contempt Defendants' sites bury all of the "fine print" at the bottom of each screen, so consumers would have to scroll through the entire page to see it.  PX1 Att. Q pp.4-6.

only the first few sentences, which did not alert them to the true nature of the site.  PX3 ¶¶95-99;
*see also* PX15 ¶5 ("When I reached the page, a pop-up window appeared, which I clicked out of
right away without reading because it looked like standard information about the site.")  At the
end of the study, Dr. Mazurek specifically directed participants to read the disclaimers and
explain what they said; even after doing so, only 13.4% of one sample and 40% of the other
noted that the site would not renew their driver's license.  PX3 ¶¶99.

> b) **Contempt Defendants Seek to Evade Scrutiny Prompted by Chargebacks**

Unsurprisingly, Contempt Defendants and their merchant-processing entities have
perpetual problems with chargebacks (*i.e.,* refunds credit card companies issue when consumers
successfully dispute transaction).  *See* PX5 ¶¶15-18, Atts. A, B; PX7 ¶9.  Credit-card networks
monitor chargebacks in part because high chargeback rates are a sign the merchant is making
unauthorized charges or using deceptive marketing.  PX7 ¶¶10-13.  If a merchant exceeds set
ratios and limits (*e.g*., Visa's current chargeback-to-sales threshold of 0.9%), credit-card
processors flag their accounts for fraud monitoring, suspension, or termination.  PX7 ¶¶10-12.

Contempt Defendants apparently attempt to avoid chargeback scrutiny by selling through
dozens of the operation's own websites.  PX1 ¶¶18-20, Atts. B, BH.  This allows them to obtain
more processing accounts for an identical product, a dubious practice known as "load
balancing."  *See* PX11 (merchant accounts); PX7 ¶¶14-15 (load balancing described).  Indeed,
several payment processors flagged or shut down the merchant accounts selling Contempt
Defendants' "services" for suspected load balancing.  *See* PX11, Att. C p.8 (business "has
several accounts on our portfolio and a likely candidate for load balancing."), Att. C p.30, Att. B
p. 119 (prior accounts "declined … for load balancing" and noting of new application, "It's clear
that since I declined the other account, they just found another signer to board a new one"), Att.
B pp.120-123.  Furthermore, by breaking charges into two installments and refunding only the
larger charge when challenged, PX1 ¶¶128-130, PX5 Att. E p.3, Contempt Defendants inflate
their sales counts (the chargeback-ratio denominator), which depresses their chargeback ratio.
PX7 ¶¶16-19.  Indeed, the operation pays an entity called "Chargeback Help," which advertises
services to help merchants "reduc[e] chargeback rates by up to 40% and recover revenue lost due
to disputed transactions."  PX1 ¶203; PX4 ¶13.

Despite the operation's intensive efforts to evade chargeback thresholds, its chargeback rates still hover around 1 to 2%, above the threshold for increased fraud scrutiny.  PX5 Atts. A, B; PX7 ¶¶8-12.  Their merchant accounts triggered one of Visa's chargeback monitoring thresholds 64 times in just three years.  PX5 ¶18, Atts. C, D.  Payment processors have closed many of their merchant accounts, often citing chargeback problems.  PX11 and Atts. A p.38 (noting applicant "was previously declined for chargebacks"), B p.124, 125-127, C pp.8, 30, 31 (processor email seeking chargeback reduction plan).

### 2.    Contempt Defendants' Public Benefits Websites Do Not Provide the Assistance They Promise

Katz's companies also operate dozens of websites that promise to verify consumers' eligibility for public benefits, such as housing assistance, food stamps, Medicaid, or unemployment benefits.  PX1 ¶¶25, 134, Atts. H, U, AD, AF, AH, BH pp.7-8.  These sites appear high in search results and sponsored links when consumers search for ways to obtain public benefits.  For example, an FTC investigator's search for "section 8 housing apply" on May 6, 2019 returned Katz's site "section-8-housing.org" as the top link.  PX1 ¶65, Att. U p.1; *see also* PX1 ¶88, Att. AD p.1.

Clicking through the benefits sites, [14] consumers encounter a prominent headline inviting them to "Find Out If You Are Eligible for [Public Benefit]" or "Find out if you Qualify …"  *E.g.*, PX1 Atts. H p.5 ("Find Out If You Are Eligible for the Medicaid Program"), U p.2, AH p.1 ("Find Out If You Are Eligible For The Food Stamps Program With Our Guide By Completing Your Information Below").  Clicking through this page leads to a series of screens soliciting consumers' contact information, medical and health conditions, employment status, income, and credit-card debt. [15]  PX1 ¶¶ 71-72, 116-117, Atts. U, AH.  Each data-gathering screen contains a

---

[14] Some of the sites tout that they have helped a specific, large number of consumers, which does not appear to change from site to site.  *E.g.,* PX1 Att. H p.1 ("We have helped 234,932 with Veterans Benefits"); 3("We have helped 234,932 Texas Residents").

[15] The sites contain lines of small-print text at the top and bottom of the page disclaiming government affiliation (for example, "This site is privately owned and is neither affiliated with, nor endorsed by, nor operated by any government agency.  We provide time saving information.").  *E.g.*, PX1 Atts. H, U pp.2-3, AH p.1.  Similar to Katz's companies' motor vehicle sites, such "disclaimers" are irrelevant to the sites' promise to provide an eligibility determination, regardless of whether they are privately owned, and are inconspicuously placed in small font, where consumers are unlikely to read them.  *Id.*  As described below, expert testing of the sites confirmed that many consumers do not notice or understand these disclaimers.

bold headline above the form, including, for example, "Confirm Your Date of Birth and Gender to Verify Eligibility," "Confirm Your Eligibility," and "Confirm your information to get your Eligibility Guide." *Id.*[16]

In fact, the sites do not "confirm," "verify," or "check" consumers' eligibility for public benefits.  PX1 ¶¶76, 121.  Instead, they redirect consumers to a page informing them, for example, "Your guide has been sent to your Email."  PX1 ¶¶72-74, 118, Atts. U p.29, AH p.24. Consumers then sometimes receive an email from the sites with a link to download a PDF guide containing publicly available, general information about the selected public benefit.[17]  PX1 ¶¶75, 120, Att. W.

Like Katz's motor-vehicle and licensing sites, his public benefit sites generate consumer complaints.  From September 30, 2014 to October 30, 2019, the FTC's consumer response database received 66 complaints referencing one of the public benefits websites.  PX1 ¶217. Most (25) concerned the website "section-8-housing.org;" and the next-largest groups of complaints related to "food-stamps.com" (19) or "Obamacare-guide.org" (9).  PX1 ¶¶218-220. Some complainants found the websites when they sought information about a benefit through an online search engine.  *Id.*  Some reported they provided their information to determine their eligibility for a benefit, and some of those reported fearing identity theft.  *Id.*  Many consumers complain they received unsolicited text messages, emails, and phone calls after providing their information.  *Id.*  The FTC's undercover buy corroborates these complaints.  Immediately after completing transactions on the Section 8 and food stamps sites, the FTC investigator began receiving texts and emails.  PX1 ¶¶77, 117, 122-123, Atts. X, AK, AL.  These included offers for psychic counseling, job-search assistance, government grants, and more.  *Id.*  Because the

---

[16] Clicking on some screens launches a new window with a third-party website, while the original window navigates consumers to the next question.  PX1 ¶71, Att. U pp.13-14, 16-17. For example, on May 6, 2019, when the FTC investigator answered "Yes" to "Are you struggling with over $10k in debt?" a new window launched with Accredited Debt Relief's landing page.  The page promised to "Reduce Your Debt & See How Much You Can Save." PX1 ¶71, Att. U pp.13-14.

[17] For example, after the FTC investigator provided information to section-8-housing.com in May 2019, she received a PDF titled "Section 8 Housing" that includes general information about housing vouchers.  PX1 ¶75, Att. W.   Notably, after completing the questionnaire on Contempt Defendants' food stamps website in September 2019, the FTC investigator received the same Section 8 guide in her email.  PX1 ¶120, Att. AJ.  Her undercover identity never received any guide about food stamps, nor any eligibility verification.  PX1 ¶¶120-121.

investigator used a fresh email account, this spam is largely, if not wholly, the result of Contempt Defendants selling consumers' information to third parties.  This fact is confirmed by bank records demonstrating Contempt Defendants, through their subsidiaries, have received large sums from lead buyers.[18]  PX1 ¶¶203-204; PX4 ¶¶10-12.

Katz's sites do not clearly disclose that consumers are entering their information for sale, rather than help with a benefit.  *See* PX1 Atts. H, U, AH.  Their only reference to data sales is a mention of "Marketing Partners" in two places:  a context-free menu of links at the bottom of the page, and in a small block of text on the screen that solicits consumers' phone numbers.[19]  PX1 Atts. U p.5, AH p.3.  Importantly, this small-print block of text never states that Contempt Defendants will sell the detailed information collected on other screens, or that consumers will not receive the promised eligibility determination.  *Id.*

        a)      **Study Confirms Contempt Defendants' Public Benefits Sites Mislead Consumers**

Dr. Mazurek's consumer-perception testing confirmed consumers believe Katz's operation's public benefits sites will use their information to check their eligibility for benefits, or to apply for those benefits directly.  PX3 ¶¶106-107, 120-121.  Dr. Mazurek conducted a

---

[18] The FTC has sued Katz's operation's client Simple Insurance (also d/b/a Simple Health) for selling sham health insurance plans.  *See* PX1 ¶¶221-223, Att. BF (Contempt Defendants and their subsidiaries sold leads to Simple Health Plans LLC); *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346 (S.D. Fla. 2019) (granting preliminary injunction against defendants based on the FTC's Section 5(a) and Telemarketing Sales Rule claims).  The FTC brought suit because Simple Health lured consumers to its bogus plans through deceptive lead generation websites, including Katz's website obamacare-guide.org, that purport to provide information about comprehensive health insurance.

Similarly, the FTC alleged that another Katz client, AdMediary, bought leads it used to enroll financially vulnerable consumers in purported "discount clubs" that charged consumers' bank accounts without their consent.  *See* PX1 ¶204; PX4¶10 (AdMediary paid Katz's companies more than $3 million); Second Amended Complaint, ¶¶43-45, 193, *FTC v. Hornbeam Special Situations LLC*, Case No. 1:17-cv-03094-WMR (N.D. Ga. Nov. 5, 2018).

[19] One site (food-stamps.com) mentions third party offers adjacent to the central form area of the page, saying "We request your email so we can email you our Comprehensive Guide, we also ask a few personal questions so we can customize the third party offers and advertisements, we believe we can assist you, to your specific situation."  PX1 Att. AH p.1.  The mention is buried in the middle of long small-print block of text.  *Id.*  Moreover, even consumers who read the text are unlikely to understand that the sites will sell their information, not help them obtain food stamps, as the text states that the site asks questions "so we can customize" the offers consumers receive.  *Id.*

preliminary in-person study and an online survey of one of the operation's Section 8 websites. PX3 ¶¶15-18.  The study demonstrates that most consumers who reach the benefits sites, and particularly those who provide their personal information, believe the site will provide an eligibility determination.  PX3 ¶¶106-107.  Indeed, about half of participants – whether they entered information or not – believed the site was government-operated.  PX3 ¶¶109-110.

## III.   ARGUMENT

### A.     The FTC Has Met the Legal Standard for Finding Civil Contempt

This Court has authority to enforce its orders through civil contempt.  *See Shillitani v. United States*, 384 U.S. 364, 370 (1966).  As a party to the original action, the Commission may invoke the Court's order enforcement power by initiating a civil contempt proceeding in the same action.  *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444-45 (1911).  Contempt is established where there is clear and convincing evidence that the "violated order was valid and lawful; . . . the order was clear and unambiguous; and the . . . alleged violator had the ability to comply."  *FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010) (ellipses original); *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000) (citation omitted).[20]  Furthermore, injunctions are enforceable against any nonparty with "actual notice" of the order who is "in active concert or participation" with a defendant to violate it.  Fed. R. Civ. P. 65(d)(2)(C).

Here, clear and convincing evidence establishes that Katz has failed to comply with clear and unambiguous provisions of the Order.  Moreover, Corporate Contempt Defendants have acted in active concert or participation with Katz.  *See Leshin*, 618 F.3d at 1235-39.  Thus, all Contempt Defendants are liable for contempt.

### 1.     Contempt Defendants Have Violated the Permanent Injunction.

Section II of the Order prohibits the defendants and "all other persons in active concert or participation" with them who receive actual notice of the Order from "making, or assisting others in making, expressly or by implication, any false or misleading material representation, including representations concerning the cost, performance, efficacy, nature, characteristics, benefits, or safety of any product or service… ."  Order at 3.  The Contempt Defendants' deceptive websites violate this Order.

---

[20] Once this *prima facie* showing of a violation is made, the burden then shifts to the alleged contemnor to produce evidence explaining its noncompliance.  *See Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (quoting *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991)).

a) **Deceptive Motor Vehicle and Other State Licensing Websites**

As described above, Contempt Defendants' licensing and motor-vehicle sites represent they will provide state services – *e.g.*, renewing a driver's license or providing a fishing license. Via search-engine advertising, they place their sites high in search results, and those results link to official-looking, often ".org" feeder websites, leading consumers to trust the sites. The sites prominently claim consumers can "Renew your License," "Renew Car Registration," and "Skip the Line" to conduct DMV transactions or get other state licenses online. Throughout the transaction, the websites solicit information consumers would expect to provide to a state licensing or motor vehicle website. However, Katz's operation never provides the promised services, instead sending only a PDF of general, publicly available information. Indeed, the very nature and cost of Contempt Defendants' "services" demonstrates their deception; consumers are unlikely to knowingly pay nearly $30 for public information they can obtain for free.

The evidence shows that Katz's companies' licensing and motor vehicle sites overwhelmingly mislead consumers. As described in Section II.B.1.a above, an expert's study demonstrated that nearly half of test subjects paid for Contempt Defendants' services, and of them, more than 85% expected to receive a renewed license, not a PDF "guide." None of the "fine print" remedied this misrepresentation because consumers did not notice it, and many failed to understand it even when specifically directed to read it. PX3 ¶¶93-99, 116-119. The sites thus exemplify longstanding law that disclosures are ineffective if the net impression of the marketing is nevertheless misleading. *FTC v. World Patent Mktg., Inc*., Case No. 17-CV-20848, 2017 WL 3508639, at *13 (S.D. Fla. Aug. 16, 2017) (quoting *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)). Indeed, as described in Section II.B.1 above, the FTC received more than 900 complaints from consumers that Katz's companies did not provide the services consumers expected. Even more consumers complained to their banks and credit-card companies, causing Katz's operation to face increased fraud monitoring and, in many instances, have merchant accounts terminated. *See* Section II.B.1.b *supra*.

A claim is material if it "address[es] the central characteristics of the product or service offered." *World Patent Mktg.,* 2017 WL 3508639, at *11 (claim is material if it "address[es] the central characteristics of the product or service offered"). Here, Contempt Defendants' misrepresentations concerned the essential nature of the services consumers sought. Thus, the misrepresentations on their operation's licensing and motor vehicle sites are material. *See*

*Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266.  Because the Contempt Defendants made material misrepresentations about the "nature, characteristics, [and] benefits" of their services on their operation's licensing and motor-vehicle websites, they are in contempt of the Order.

**b)**  **Deceptive Public Benefits Websites**

As described above, Contempt Defendants' public benefits websites claim they will verify or confirm consumers' eligibility for public benefits.  The sites appear high in search results and often use ".org" domain names that appear trustworthy to consumers.  The sites contain a brightly-colored "Eligibility" button under a headline "SELECT THE SERVICE YOU ARE LOOKING FOR" or a bold headline stating, for example, "Find Out If You Are Eligible for [Public Benefit]."  Importantly, consumers who click through the websites' form see a representation on nearly every screen that instructs consumer to provide information to, for example, "verify eligibility."  However, Contempt Defendants do not verify consumers' eligibility, instead emailing consumers a PDF of general, publicly available information.

Katz's companies' public benefits websites mislead consumers.  As described above in Section II.B.2.a, despite the sites' small-print "disclosures," many consumers believe the sites will check their eligibility for public benefits and do not understand that their information will instead be sold to marketers.  PX3 ¶¶120-121.  Consumers' complaints confirm these findings. Specifically, consumers state they thought the benefits sites would check their eligibility for public benefits.  After visiting Contempt Defendants' public benefits websites, many consumers reported fearing identity theft.

Contempt Defendants' misrepresentations are material because they concern the core characteristics of the services Contempt Defendants purport to offer – a central element of consumers' decision to provide their information.  *In re Southwest Sunsites, Inc.*, 105 F.T.C. 7, 149 (FTC 1985) ("A material representation or practice is one that is likely to affect a consumer's choice of or conduct regarding a product or service."); *see also World Patent Mktg.*, 2017 WL 3508639, at *11.  Thus, Contempt Defendant's benefits-related representations also place them in contempt of the Order.

**2.**  **The Permanent Injunction Is Valid, Lawful, Clear, Definite, and Unambiguous.**

There is no question that the Order is valid and lawful.  The parties jointly moved the Court to enter the stipulated Order, and the Court did so after finding it had jurisdiction over the

17

matter.  Order at 2.  Importantly, the Order reflects the negotiated agreement of the parties.  In addition, the Order's provision prohibiting misrepresentations is clear, definite, and unambiguous.  *See FTC v. EDebitPay LLC*, 695 F.3d 938, 943-44 (9th Cir. 2012) (holding provision prohibiting all misrepresentations in the sale of any product or service specific and definite).

### 3.    The Contempt Defendants Had Notice and the Ability to Comply.

As a party who signed the Order, Katz has notice of the Order and is bound by it.  Fed. R. Civ. P. 65(d)(2)(A) (binding parties).  Moreover, Katz had the ability to comply with the Order.  To satisfy an inability defense, Katz must demonstrate that "he has made 'in good faith all reasonable efforts' to meet the terms of the court order he is seeking to avoid."  *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (per curiam) (citations omitted).  Indeed, it is insufficient to make efforts that are merely "substantial," "diligent," or in "good faith."  *Id*.  Here, Katz simply could have refrained from making the deceptive claims.[21]

The Corporate Contempt Defendants also had notice and the ability to comply.  Katz is an officer for each of these corporate entities, and his knowledge of the Order is thus imputed to them.  *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, n.18 (E.D. Mo. 2007); *see also Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017) (knowledge of corporate officer is imputed to corporation under agency law).  Moreover, where a corporate officer or control person is named in an order, that order also binds the officer's companies.  *See Leshin*, 618 F.3d at 1235-36 (binding entity owned by named corporate defendant whose officers and control persons were individual defendants).  The Order is thus binding on Corporate Contempt Defendants.  Moreover, similar to Katz, Corporate Contempt Defendants did not lack the ability to comply, because they could have simply avoided making misrepresentations.

---

[21] Defendants who believe that there are extenuating circumstances or that the decree is too burdensome can petition the court for clarification or modification.  *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949); *Combs v. Ryan's Coal Company, Inc.*, 785 F.2d 970, 979 (11th Cir. 1986).  "If a defendant acquiesces in a decree and undertakes to make his own determination of its meaning, having been alerted by it he acts at his own peril."  *Wirtz v. Ocala Gas Company, Inc.*, 336 F.2d 236, 240 (5th Cir. 1964).  Katz did not seek clarification whether his conduct complied with the permanent injunction.  Indeed, he failed to disclose his activities to the FTC in his sworn compliance report to shield them from law enforcement scrutiny.

**B.**     **Contempt Defendants Should Compensate Consumers For the Harm Their Contumacious Conduct Caused.**

Courts may impose sanctions for civil contempt to "coerce the contemnor to comply with a court order, or [to] compensate a party for losses suffered as a result of the contemnor's act." *See McGregor v. Chierico*, 206 F.3d 1378, 1385 n.5 (11th Cir. 2000).

Here, Contempt Defendants should be ordered to pay compensatory monetary relief to the victims of their contempt for the harm caused by their contumacious misrepresentations. *See McComb v. Jacksonville*, 336 U.S. 187, 193 (1949) ("The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.")  Because Contempt Defendants' material misrepresentations were widespread, it is presumed that all consumers relied upon, and were therefore injured by, Contempt Defendants' misrepresentations. *See McGregor*, 206 F.3d at 1388-89; *FTC v. Trudeau*, 579 F.3d 754, 773 n.15 (7th Cir. 2009). Accordingly, should the Court find the Contempt Defendants violated the Order, the Commission will seek a compensatory award in the amount consumers paid for services the Contempt Defendants never provided.  *Leshin*, 618 F.3d at 1237; *McGregor,* 206 F.3d at 1388-89 ("The fraud is in the selling, not the value of the thing sold, [which] is what entitles consumers in this case to full refunds . . . .") (quoting *FTC v. Figgie, Int'l.*, 994 F.2d 595, 606 (9th Cir. 1993).[22]

**IV.     CONCLUSION**

Given Contempt Defendants' blatant violations of the Order, the FTC respectfully requests that the Court grant the FTC's motion, enter the proposed Order to Show Cause, and set a hearing in this matter. [23]

---

[22] Moreover, monetary relief should be entered jointly and severally because the Contempt Defendants acted as a unified operation to carry out the Order violations.  *Leshin*, 618 F.3d at 1237  ("Where . . .  parties join together to evade a judgment, they become jointly and severally liable for the amount of damages resulting from the contumacious conduct.") (quoting *NLRB v. AFL-CIO*, 882 F.2d 949, 955 (5th Cir. 1989)).

[23] As the FTC noted during the preliminary injunction hearing held in the *On Point Global* case, the FTC proposes that the Court hold one set of factual proceedings relating to this contempt motion and the *On Point Global* action.  (Hearing Tr. vol. 1, 221:11-23, Jan. 10, 2020.)  There are common questions of law and fact in these cases, including that acts violating the FTC Act in *On Point Global* also violate the *Acquinity* permanent injunction.  *See On Point Global, LLC*, Case No. 19-CV-25046-SCOLA (Dkt. 5 at 2).  In addition, the FTC's evidence establishing violations of the FTC Act will also satisfy the clear and convincing standard to hold the

V.      **LOCAL RULE 7.1.A.3 CERTIFICATE OF COUNSEL**

The FTC conferred with counsel for Burton Katz, On Point Global LLC, On Point

Employment LLC, On Point Guides LLC, Cambridge Media Series LLC, Issue Based Media

LLC, DG DMV LLC, Direct Market LLC, and Bronco Family Holdings LP by telephone on

January 22 and 23, 2020, and in-person on January 28, 2020.  The FTC conferred with counsel

for Waltham Technologies LLC by telephone on January 27, 2020.  The FTC conferred with

counsel for Dragon Global LLC, Dragon Global Management LLC, and Dragon Global Holdings

LLC by email on January 29, February 5, and February 6, 2020, and by telephone on February 7,

2020.  Counsel for the affected parties were unable to resolve the issues raised in this motion by

conference; all Defendants and Contempt Defendants oppose this motion.


Dated:  February 12, 2020                    Respectfully submitted,

                                             */s/ Sarah Waldrop*
                                             Sarah Waldrop, Special Bar No. A5502583
                                             (202) 326-3444; swaldrop@ftc.gov
                                             Sana Chaudhry, Special Bar No. A5502350
                                             (202) 326-2679; schaudhry@ftc.gov
                                             Federal Trade Commission
                                             600 Pennsylvania Ave NW, CC 9528
                                             Washington, DC 20580
                                             Facsimile: (202) 326-3197


                                             Attorneys for Plaintiff
                                             FEDERAL TRADE COMMISSION

---

defendants in contempt of the *Acquinity* Order, *see id.*; upon receiving this evidence, the Court
can make separate findings under the two standards without the need to receive the same
evidence in separate proceedings.  It is thus in the interest of judicial economy to hold one set of
factual proceedings.

## CERTIFICATE OF SERVICE

I hereby certify that, on February 12, 2020, a true and correct copy of the foregoing was served on all counsel via email and mail.

**Counsel for Defendants Burton Katz, Brent Levison, Elisha Rothman, Christopher Sherman, On Point Global LLC, On Point Employment LLC, On Point Guides LLC, DG DMV LLC, On Point Domains LLC, Final Draft Media LLC, Cambridge Media Series LLC, Issue Based Media LLC, Bella Vista Media Ltd., Carganet S.A., Direct Market LLC, Bluebird Media LLC, Borat Media LLC, Bring Back the Magic Media LLC, Chametz Media LLC, Chelsea Media LLC, Coinstar Media LLC, Domain Development Studios LLC, Domain Dividends Media LLC, Eagle Media LLC, Falcon Media LLC, GNR Media LLC, Island Media LLC, Leatherback Media Group LLC, Macau Media LLC, CEG Media LLC, MBL Media Ltd. Inc., Orange and Blue Media LLC, Orange Grove Media LLC, Panther Media LLC, Pirate Media LLC, Pivot Media Group LLC, PJ Groove Media LLC, Sandman Media Group LLC, Shadow Media LLC, Skylar Media LLC, Slayer Billing LLC, Spartacus Media LLC, Very Busy Media LLC, Wasabi Media LLC, Yamazaki Media LLC, Bronco Family Holdings LP, BAL Family LP, Cardozo Holdings LLC, 714 Media Ltd., Mac Media Ltd., License America Management LLC, License America Holdings LLC, and Blackbird Media LLC:**

Robert W. Thielhelm, Jr. (rthielhelm@bakerlaw.com)
Jonathan B. New (jnew@bakerlaw.com)
Jimmy Fokas (jfokas@bakerlaw.com)
Patrick T. Campbell (pcampbell@bakerlaw.com)
Jeffrey D. Martino (jmartino@bakerlaw.com)
Lauren P. Lyster (llyster@bakerlaw.com)
Denis Durkin (ddurkin@bakerlaw.com)
Baker Hostetler
45 Rockefeller Plaza
New York, NY 10111


**Counsel for Defendants Arlene Mahon and Waltham Technologies LLC:**

Justin B. Kaplan (jkaplan@difalcofernandez.com)
DiFalco, Fernandez & Kaplan
777 Brickell Ave, Suite 630
Miami, FL 33131

Xavier A. Franco (xfranco@mcper.com)
McArdle, Perez & Franco, PL
255 Alhambra Circle, Suite 925
Coral Gables, FL 33134

**Counsel for Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC:**

Matthew Schwartz (mlschwartz@bsfllp.com)
John Zach (jzach@bsfllp.com)
Sara Winik (swinik@bsfllp.com)
Marshall Dore Louis (mlouis@bsfllp.com)
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, NY 10001

**Counsel for Defendant Elisha Rothman:**

s/ Solomon B. Genet (sgenet@melandrussin.com)
Joshua W. Dobin (jdobin@melandrussin.com)
Meland Russin & Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131

**Counsel for Receiver Melanie E. Damian:**

Kenneth D. Murena (kmurena@dvllp.com)
Damian & Valori, LLP
1000 Brickell Avenue, Suite 1020
Miami, FL 33131

*/s/ Sarah Waldrop*
Sarah Waldrop
