UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 14-60166-Civ-SCOLA

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

ACQUINITY INTERACTIVE, LLC, *et al.*,

     Defendants.

**PLAINTIFF'S MOTION FOR AN ORDER TO SHOW CAUSE WHY
ROBERT ZANGRILLO, BRENT LEVISON, AND ELISHA ROTHMAN
SHOULD NOT BE HELD IN CONTEMPT**

     The Federal Trade Commission ("FTC" or "Commission") moves for an order to show cause why Robert Zangrillo, Brent Levison, and Elisha Rothman should not be held in contempt for violating this Court's 2014 stipulated order against defendant Burton Katz.  Specifically, this Court prohibited Katz and those acting in concert with him from making misrepresentations in the marketing or sale of any product or service to consumers.  *See* Stipulated Final Judgment and Order for Permanent Injunction, ECF No. 132 ("Order" or "2014 Order") entered on October 16, 2014.  Yet, from the time the Court entered the injunction, Katz and his associates Zangrillo, Levison, and Rothman (collectively, "New Contempt Defendants") were violating its restrictions.  As the FTC alleged in a related action filed in December 2019, Katz, 54 corporate entities, New Contempt Defendants, and two other individuals violated Section 5 of the FTC Act, 15 U.S.C. § 45, by engaging in deceptive practices in connection with an online marketing scheme, falsely offering consumers government services but delivering only worthless "guides."  *FTC v. On Point Global LLC, et al.*, No. 16-cv-25046-Scola/Torres (S.D. Fla.) ("*On Point*").  On January 14, 2020, the Court found the FTC was likely to succeed on the merits of that *de novo* action and found the defendants' websites were "patently misleading."  The FTC subsequently filed a contempt motion in this case, alleging Katz's scheme also violated the 2014 Order.  In

recent weeks, discovery in the *de novo* action – including the sworn testimony of the New Contempt Defendants – has confirmed each of these individuals knew about the 2014 Order at or near the time of its entry, making them liable for contempt of that order pursuant to Federal Rule of Civil Procedure 65(d)(2)(C).

## I.     BACKGROUND

### A.     The 2014 *Acquinity* Lawsuit and Order

In its 2014 complaint in this case, the FTC alleged that Burton Katz engaged in the deceptive and unfair practice of cramming charges on consumers' mobile phone bills.  ECF No. 88 ("Amended Compl.").[1]  To resolve the matter, Katz stipulated to an Order.  Order at 14.  That Order prohibits Katz and persons in "active concert or participation" with him from, among other things, "making, or assisting others in making, expressly or by implication, any false or misleading material representation including representations concerning the cost, performance, efficacy, nature, characteristics, benefits, or safety of any product or service, or concerning any consumer's obligation to pay for charges for any product or service."  Order at 3 (Section II).

### B.     The 2019 *De Novo* Lawsuit and Preliminary Inunction

Despite the *Acquinity* injunction, Katz continued to operate deceptive businesses he failed to disclose to the FTC in violation of the Order's compliance monitoring provisions.  PX13; Order at 8-9.  After learning about Katz's additional deceptive scheme, in December 2019, the FTC filed a complaint and *ex parte* motion for temporary restraining order against Burton Katz, five individual defendants (including Robert Zangrillo, Brent Levison, and Elisha Rothman), and 54 corporate entities.  *FTC v. On Point Global LLC, et al.*, No. 19-cv-25046-Scola, ECF Nos. 1 ("*On Point* Complaint") & 4 ("*On Point* TRO Motion") (S.D. Fla. filed Dec. 9, 2019).  The FTC's complaint alleged "more than 200" of the defendants' websites violated Section 5(a) of the FTC Act by falsely promising to provide government services.  *On Point* Compl. ¶¶112-168. The complaint further alleged that defendants are jointly and severally liable because the corporate defendants acted as a common enterprise and the individual defendants participated in, controlled, and knew of the deceptive practices.  *Id*. ¶¶61-77, 80-107.

---

[1] Katz's operation ran websites that offered free merchandise in exchange for consumers' phone numbers, and enrolled consumers who provided their information in unwanted premium text messaging services that charged them monthly.  *See* Amended Compl. ¶¶45-47.

On December 13, 2019, the Court granted the Commission's motion for temporary restraining order, finding the FTC had "established a likelihood of success in showing that the Defendants have deceived consumers by misrepresenting the services they offer, thus inducing consumers to pay money or divulge personal information under false pretenses." *On Point*, ECF No. 17 at 3-4 ("*On Point* TRO").  The Court further granted the FTC's request to, among other things, appoint a receiver and freeze defendants' assets to preserve funds for consumer redress.

Subsequently, at a two-day preliminary injunction hearing, the FTC presented documents, expert testimony, surveys, and consumer complaints showing defendants' deception. At the close of the hearing, the Court ruled the FTC had met its burden to show that the corporate entities acted as a "common enterprise" and that the individuals had sufficient "control and knowledge" to support joint and several liability.  PX46 (Prelim. Inj. Hr'g Tr. vol. 2), 314:8-18. The district court entered a preliminary injunction the following day and found that Katz and his co-defendants' websites were "patently misleading."  *On Point*, ECF No. 126 at 2 ("*On Point* Preliminary Injunction").

C.      **The First Contempt Motion**

On February 12, 2020, the FTC initiated contempt proceedings in this case against Katz and twelve Corporate Contempt Defendants[2] for violating the Order.  *Acquinity*, ECF No. 135 ("First Contempt Motion").  The FTC moved that Katz should be held in contempt because the same misrepresentations described in its *de novo* action also violate the Order's injunction against misrepresentations.  The FTC also sought to hold the 12 named corporate entities liable for contempt because they had "actual notice" of the Order and violated it "in active concert or participation" with Katz.  *Id.* at 15-18 (citing Fed. R. Civ. P. 65(d)(2)(C)).  The FTC's motion further asked that the Court consolidate the factual proceedings relating to the contempt and *de novo* actions in light of the common questions of law and fact in these cases.  *Id.* at 19 n.23.  On

---

[2] The Corporate Contempt Defendants are: On Point Global LLC, On Point Employment LLC, and On Point Guides LLC f/k/a Rogue Media Services LLC (collectively, "On Point"); Dragon Global LLC, Dragon Global Management LLC, and Dragon Global Holdings LLC (collectively, "Dragon Global"); Waltham Technologies LLC; Cambridge Media Series LLC f/k/a License America Media Series LLC; Issue Based Media LLC; DG DMV LLC; Direct Market LLC; and Bronco Family Holdings LP a/k/a Bronco Holdings Family LP.  *See* First Contempt Mot. at 2 n.2.  The Corporate Contempt Defendants are a subset of the 54 entities named in the FTC's *de novo* action.

February 14, 2020, the Court granted the FTC's motion.  *Acquinity*, ECF No. 136 ("Order to Show Cause").[3]

At the time the FTC moved for contempt against Katz, it was not aware that his co-defendants in the related *de novo* action had notice of the Order.  Evidence obtained through discovery, however, now shows Zangrillo, Levison, and Rothman each had notice of the Order around the time of its entry and acted with Katz to violate it while carrying out the deceptive practices that gave rise to the related action.  Based on this new evidence, the FTC now moves for contempt against these three individuals in addition to Katz.

## II.    STATEMENT OF FACTS

From the moment the Court entered the 2014 Order, Katz and his associates have violated its restrictions.  As the FTC previously showed, Katz employed a network of companies and individuals to operate hundreds of deceptive websites, and the New Contempt Defendants co-owned and co-managed the deceptive operation with Katz.  The following briefly summarizes the evidence previously presented to the Court regarding the Contempt Defendants' scheme and the representations on their websites.  *See* First Contempt Mot.  For a full discussion of the factual background of the relevant conduct, the Commission respectfully refers the Court to its First Contempt Motion in this case (ECF No. 35 with accompanying exhibits) and the *On Point*

---

[3] Like the original contempt motion, the FTC respectfully requests that the Court consolidate any evidentiary hearing on this matter with any trial in *FTC v. On Point Global* because there are common questions of law and fact in these cases.  *See* Order to Show Cause.  The FTC's evidence establishing the Contempt Defendants' violations of the FTC Act will also satisfy the clear and convincing standard to hold these defendants in contempt of the 2014 Order.  Upon receiving this evidence, the Court can make separate findings under the two standards without the need to receive the same evidence in separate proceedings.

Further, if the Court enters the FTC's requested show-cause order, the FTC anticipates seeking a ruling on its contempt motion without an evidentiary hearing.  Both the preliminary injunction hearing and ensuing discovery in the *de novo* matter revealed that the material facts in this matter are not in dispute – only the legal conclusions to be drawn from them.  *See Mercer v. Mitchell*, 908 F.2d 763, 769 n.11 (11th Cir. 1990) ("[W]hen there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him."); *Peterson v. Highland Music, Inc*., 140 F.3d 1313, 1324 (9th Cir. 1998) (no evidentiary hearing required where facts supporting civil contempt are uncontroverted).  Should the show-cause order be granted, the FTC will file a further motion for summary ruling as to all Contempt Defendants, to which the Contempt Defendants may respond with their own affidavits and evidence, if any.

TRO Motion.[4]  In the interests of economy, the FTC also refers herein to the exhibits originally filed in support of the First Contempt Motion (ECF No. 135)[5].  Finally, the FTC sets forth facts and evidence that supplement the First Contempt Motion and pertain to the New Contempt Defendants' actions in contempt of the Order, with knowledge thereof.

### A.  New Contempt Defendants' Active Concert and Participation in Katz's Violative Business Practices

As set forth in the First Contempt Motion and *On Point* TRO Motion Katz, Zangrillo, Levison, Rothman, and their co-defendants operated hundreds of websites that misled consumers into providing money and personal information in exchange for government services. Defendants' websites falsely offered to perform government services in two categories: (1) state licensing or motor vehicle services for a fee ("e-commerce sites"), and (2) determinations of eligibility for public benefits in return for personal information ("freemium sites").  First Contempt Mot. at 5-15; PX1 ¶¶18-25, Att. BH; *see also On Point* TRO Mot. at 1-13.

First, defendants operated "e-commerce" sites that targeted customers seeking government services, such as renewing a driver's license, through misleading search-engine advertising.  First Contempt Mot. at 5-12.  In some instances, customers who clicked on defendants' search results were directed to websites that used misleading language and branding to induce consumers to enter payment information in hopes of obtaining the promised services ("transaction sites").  In other instances, search results led customers to intermediate websites ("feeder sites"), such as DMV.com, which also used misleading language and design to lead consumers to the transaction websites seeking payment information.  *Id.*  Consumers who paid never received the promised services; instead, they received only a PDF of general information about those services.  *Id.*

Second, defendants operated "freemium" sites targeting indigent, unemployed, and elderly people with fake offers to determine their eligibility for public benefits, such as housing

---

[4] As reflected in the certificate of service, the FTC is serving the instant motion and accompanying exhibits on counsel for the New Contempt Defendants by email.  In addition, the FTC is re-serving its First Contempt Motion and accompanying exhibits on the same sets of counsel.  The FTC further notes that some evidence filed with this motion was produced with requests for confidentiality; pursuant to the FTC's regulations, the Commission therefore concurrently files a motion to file those materials under a temporary seal to permit the producing parties the opportunity to seek further protection for their documents.

[5] *See On Point*, ECF No. 132.

assistance, food stamps, and unemployment benefits ("public benefits sites").  First Contempt
Mot. at 12-15.  Defendants similarly used search-engine advertising and misleading language
and branding to induce consumers into relinquishing their personal and sensitive data, including
their name, email address, zip code, phone number, birth date, gender, employment status, health
insurance coverage status, medical diagnoses, disability status, and debt.  *Id*.  Consumers who
provided their information did not receive the promised eligibility determination; instead, they
received only a PDF document with publicly available information untailored to the sensitive
data consumers provided.  Moreover, consumers who provided their information on defendants'
websites were bombarded with spam emails and text messages containing additional marketing
"offers."  *Id*.

Both types of websites were "patently misleading": they were "cleverly designed so that
even though "disclosures" appeared on many or most of the pages, consumers['] attention would
be drawn to links and language in larger, more colorful font that directed them to the service they
were seeking."  *On Point* Prelim. Inj. at 2.  As a result, consumers "would likely ignore the
disclosures written in relatively smaller and pale colored font."  *Id*.  Indeed, even if consumers
did read the disclosures, they were not "clearly informed" that the sites did not provide the
promised government services.  *Id*.  Defendants reaped over $87 million in three years from the
deceptive sale of paid guides and over $17 million in one year from using or selling personal
information harvested from consumers who visited the public-benefits sites.  *See* PX43 ¶7; PX44
at 22-23 (Receiver's report regarding freemium revenues).

Katz and the New Contempt Defendants controlled the 54 corporate defendants in the *de
novo* action that ran the websites.  Katz was the operation's CEO, one of its two largest
shareholders, and one of three "Venture Team" members in its capital-raising arm, Dragon
Global.  The New Contempt Defendants worked alongside Katz to operate the deceptive scheme.

**Robert Zangrillo** has been Katz's business partner in the deceptive operation since at
least October 22, 2014.[6]  On that date, Zangrillo created DG DMV LLC and the next day, as
described below, he paid Katz's *Acquinity* judgment.  PX34 Att. C at 5, 8; PX35 Att. A; PX37

---

[6] Zangrillo is also the Chairman, CEO, and a "Venture Team" member of Dragon Global.  PX1
Att. G; PX37 (Zangrillo Dep.) 19:6-9.

(Zangrillo Dep Tr.) at 30:12-15.  *See infra* at 14.[7]  In or around June 2015, Katz and Zangrillo negotiated and Zangrillo funded DG DMV's acquisition of the domain DMV.com, which was central to their deceptive scheme.  PX35 Atts. T, X, J, Y; *see also* First Contempt Mot. at 2-3. Zangrillo remained DG DMV's majority shareholder, and Katz its minority shareholder, until January 1, 2018, when he and Katz contributed their respective interests in DG DMV to On Point Global LLC.  PX34 Atts. B at 26-27 (Katz and Zangrillo were members), 35 (Zangrillo's company held 80% interest); I at 1, 18 (chart of assets contributed by Zangrillo's and Katz's holding companies).[8]  Zangrillo provided Katz with funding for both DG DMV and On Point, helped formulate their business plan[9] and corporate structure, and worked with Katz to design On Point's logo and corporate website.  PX35 Atts. J and Y (DGDMV funding), U (OPG LLC corporate structure), M (logo); PX33 Atts. B, AT (website), A (OPG LLC corporate structure); PX37 (Zangrillo Dep.) 30:7-22, 207:3-20 (investment in DG DMV and On Point Global).

Zangrillo and Katz were the largest shareholders of On Point, each holding a 35% interest in the company at its inception.  PX12 Att. C p.115; PX34 Att. E at 65 (Schedule 3.1 to 2018 agreement).  Zangrillo was the company's chairman, and Zangrillo and Katz wielded "special approval rights" over all company decisions, were initially the sole members of the Board of Managers, and had the authority to hire and fire key personnel, including the CEO and CFO. PX18 Att. A at 64-135; PX34 Atts. E at 17-20 (Sec. 3.8, special approval rights and hiring/firing authority), D (consulting agreement); PX36 (Katz Dep.) 20:17-22:5.  As chairman, Zangrillo

---

[7] Katz also testified that Zangrillo loaned him the funds to pay his judgment.  PX36 (Katz Dep.) 99:13-100:16.  The same day Zangrillo created DG DMV, the company and Katz signed agreements relating to the loan and establishing Katz's business partnership with Zangrillo. PX35 Att. L at 2-10 (option purchase agreement), 11-13 (side letter), 14-21 (security agreement), 22-29 (option purchase agreement), 30-37 (guarantee), and 38-45 (promissory note).  For instance, one such agreement gave Zangrillo the option to purchase assets of Cambridge Media Series LLC, a defendant in both the *de novo* and contempt actions.  *Id*. at 2, 4-5, 9.

[8] Zangrillo held his interest in both DG DMV and On Point Global through his holding company and *de novo* defendant OnPoint Capital Partners LLC.  PX34 Att. E at 65; PX37 (Zangrillo Dep.) 30:7-22, 226:12-227:4; *see also* PX12 Att. C p.115 (On Point ownership).  Katz's holding company is Bronco Family Holdings LP.  PX13 at 1-2; First Contempt Mot. at 4.

[9] For example, Katz consulted with Zangrillo to develop DG DMV's business plan, including its data monetization and e-commerce products, under "Dragon Global" branding.  PX35 Att. D.

approved and consulted with Katz on both major decisions affecting the business[10] and its day-to-day operations.[11]  Zangrillo was the lead recruiter for new investors and assured them that as chairman, he had "been very active in [his] role."  PX33 Att. AI; PX36 (Katz Dep.) 26:5-22.  He and Katz spoke every other week, *id*. at 131:17-132:8, and drafted materials for and worked with third parties, such as auditors, PX33 Atts. AC, AB; PX35 Att. N; public relations firms, PX33 Att. AW (setting up meeting), PX35 Att. R (identifying PR firm); and investors, PX35 Atts. H (draft investor response for Zangrillo's review), I (investor response sent), G (investor presentation), O, Q (Zangrillo's comments on draft presentation); PX33 Atts. AK, AP.

Zangrillo's investor presentations prominently promoted On Point's "Free Guides," "Paid Guides," "Services," and acquisition of "Third Party Data."  *See, e.g.*, PX25 Att. Z at 5-6; PX33 Att. AP.[12]  Zangrillo and Katz recruited members to join On Point's advisory board (*see, e.g.*, PX33 Atts. AS (Zangrillo's goals include: "Support recruiting of senior executives, board members and advisors.  [] Leverage DG to attract advisor for CTO, VP People Operations, VP of

---

[10] Zangrillo was closely involved in recruiting the company's CFO Robert Bellack, PX44 at 30, PX33 Atts. Z at 1, 3, AA, AH, who upon joining also became an Operating Partner at Dragon Global and reported to Katz and Zangrillo.  PX34 Att. A (Bellack's offer letter), PX1 Att. G; *see, e.g.*, PX33 Atts. BW at 1-2, BT, BQ, BH.

[11] Zangrillo also signed corporate resolutions to authorize other actions including opening new bank accounts, taking out credit, acquiring new domains, leasing new office space.  PX18 Att A at 64-135.  In fact, Zangrillo involved himself in matters as small as the removal of a freezer from the office.  PX25 Att. AA p. 267.  Further, he took advantage of his control of On Point Global to obtain perks for himself, his family, and his friends, including:  paying half of his chief of staff's salary, PX34 Att. H (invoice for Megan Black's salary), PX33 Att. BB (adding Zangrillo and his employees to On Point payroll), and transferring a commercial lease to cut his other business' costs, PX34 Att. L (sublease); PX35 Att. K (list of plans to cut costs); renting office space from a real estate development in which Zangrillo was a partner, PX33 Att. BV at 2; giving internships to his two daughters and one of their friends, PX33 Atts. AU, AY, AZ, BA, D, U, AL, PX37 (Zangrillo Dep.) 248:22-249:3, 242:24-243:12 (identifying daughters and other intern); keeping his former girlfriend on the payroll, PX36 (Katz Dep.) 144:5-9, PX37 (Zangrillo Dep.) 252:18-253:19 (identifying Emily Paulshock); PX33 Atts. BV at 3 (Rothman asked Zangrillo why "we can't get paid back for paying a salary to your girlfriend who didn't really work for us"), BD (Ms. Paulshock on payroll as "Executive Assistant"); and paying an executive assistant who primarily helped Zangrillo and his family with personal tasks, PX33 Atts. AX (Taylor Corson, On Point employee, states "I work for Bob Zangrillo" while seeking to get his furniture repaired), BN (Ms. Corson helping Zangrillo's daughter look for apartments).

[12] As the Receiver reported, Zangrillo "reviewed and approved the slide deck for the investors, coordinated [and] … sat in on investor meetings, and updated the investors after the investments had been made."  PX44 at 31.

Corporate Development."), AD (attachment omitted), AE; *see also* PX25 Att. AA at 53-54 (Zangrillo solicited counsel from the advisors on important issues for the company and asked for a call with him and Katz); traveled to Latin America together to expand On Point's operations and investors, PX33 Atts. M at 2 (Brazil itinerary showing meeting with Zangrillo and Katz), O; attended management meetings, PX37 (Zangrillo Dep.) 160:2-10 (Zangrillo testifying that he generally met "monthly" with On Point CEO and CFO), *see also* PX33 Atts. AM, J, T; and closely managed the company's financial performance, *see, e.g.*, PX35 Atts. R, P, PX33 Atts. BH, BK, BL, BM, AF.  Zangrillo also assisted the deceptive operation with obtaining new merchant processing bank accounts, PX35 Atts. Z, AA, and purchasing and appraising domains, PX35 Atts. V, PX33 Atts. R (intern Zangrillo recommended reported to him and Katz on domain research), BY at 2 (Zangrillo requested "Appraisal with detail by Domain"), D.

Zangrillo remained On Point's chairman until March 2019, when he was arrested and later indicted in an unrelated college-entrance bribery matter known as "Varsity Blues."[13] Shortly after the indictment, Zangrillo amended his agreement with On Point and formally resigned "as Chairman and Officer," stating that he would "no longer have any day to day management responsibility" over On Point.  PX34 Att. F.  Zangrillo, however, continued to facilitate the operation, testifying that only his title, not his role, changed at that point.  PX37 (Zangrillo Dep.) 133:10-134:11, 145:25-146:3; *see also id.* at 240:21-241:1 (Zangrillo resigned; he was not terminated), PX23 Att. A at 21-22, 29-30 (Zangrillo retained special approval rights and insurance requirement).  Specifically, Zangrillo remained on the Board of Managers, which possessed "full, complete and exclusive authority, power, and discretion to manage and control the business."  PX23 Att. A at 30.[14]  Further, Zangrillo continued to provide updates to investors, assisted in closing the company's deal to acquire a third party business, participated in weekly management calls with Katz, and was "taking the lead" on negotiating rent for the Los Angeles

---

[13] *United States v. Sidoo, et al.*, No. 1-19-cr-10080, ECF Nos. 4, 32, 314 (D. Mass.) (arrest warrant, return of executed arrest warrant, and second superseding indictment).

[14] The LLC agreement was further modified in October 2019 to obscure Zangrillo's involvement in the business because his co-defendant Rothman did not wish to risk losing the company's banking relationships due to Zangrillo's indictment.  PX38 (Rothman Dep.) 133:3-144:5; PX35 Ex. AB; PX34 Att. G.  Even under the modified agreement, Zangrillo's holding company retained his ownership stake, with control rights and board seat vested in a subsidiary that lists as its "Manager" attorney Bruce Weil of Boies Schiller Flexner LLP, which represented Zangrillo and Dragon Global Management LLC.  PX34 Att. G at 69-70; PX47 at 8.

office.  PX33 Atts. BT, CC, CD, BI, BJ, BP.  In fact, the week before the FTC initiated the *de novo* action, Zangrillo was formulating the company's "executive offsite" meeting with Katz and proposing to be part of the "Team to accomplish" several goals of the company, including "[r]ecruit[ing] a world-class team of quarterbacks for executive roles around Product Management, Market and Engineering for the SaaS / Data Business, Publishing Business and the eCommerce Business"; "[p]repar[ing] a product roadmap, timeline and milestones for Tech Platform, SaaS / Data business and eCommerce Business"; and "[p]repar[ing] a clear separation of each of the Business Units[.]"  PX33 Att. BY at 1-2.

 **Brent Levison** has been Katz's top lieutenant since at least 2012 and played a crucial role in forming the sprawling network of dozens of companies that carried out Katz's deceptive scheme.  *See On Point* TRO Mot. at 22-23.[15]  Levison was Katz's operating partner and managed over 22 other corporate defendants.  PX36 (Katz Dep.) 95:9-13 (Katz brought in Levison and Rothman as operating partners and built the original "On Point team"); PX41 (Levison Interrog. Resp.) at 4.[16]  Moreover, Levison assisted Katz with managing nearly every aspect of the deceptive operation, including by obtaining several of the company's private mailboxes, PX9 and attachments; signing and managing its corporate filings, PX1 Att. BB, PX33 Atts. AN, AQ, AO (registered agent service orders); negotiating and signing leases for its office space, PX12 Att. C at 5, 17-22, 40, PX35 Att. W; registering 177 of its domain names for privacy services, PX1 ¶180, Att. AZ at 4-6; and providing services to investors, PX36 (Katz Dep.) 105:6-18.  Further, Levison created companies to obtain advertising accounts for the deceptive sites, PX33 Att. BU, and used his corporate credit cards to pay for search-engine ads, *see, e.g.*, PX33 Att. BO at 1-2.  Levison was also a signatory on at least 30 of the operation's bank accounts.  PX12 and attachments.

 Similar to Katz and Zangrillo, on January 1, 2018, Levison contributed his assets in other companies to become the fourth-largest shareholder of On Point Global.  PX34 Att. I at 1, 19-21; *see also* PX12 Att. C at115 (On Point ownership); *supra* n.15 (Cardozo is Levison's holding

---

[15] In 2012, Katz, Levison, Katz's *Acquinity* co-defendant Jonathan Smyth, and another individual created Pivot Media Group LLC, and became its founding board members and officers.  Pivot Media Group is a defendant in the FTC's related *de novo* action.  PX34 Att. O at 1, 13, 20, 36; *see also On Point* TRO Mot. at 15 (Cardozo Holdings LLC, a defendant in the *de novo* action, is Levison's holding company); PX33 Att. N.

[16] Levison is an attorney and also served as counsel to these entities.  PX41 at 4.

company).  At that time, Levison became On Point's Senior Vice President of Products and Chief Administrative Officer.  PX41 at 4.  In these roles, among other things, Levison supervised the payment processing and call center operations for the deceptive scheme, reporting directly to Katz.  PX34 Att. N; PX39 (Levison Dep.) 53:1-8.[17]

To facilitate payment processing on the deceptive sites, Levison and his team worked closely with merchant account representatives to, among other things, obtain new accounts (*see, e.g.*, PX33 Att. W) and manage account issues, chargeback ratios, and terminations.  *See, e.g.*, PX33 Atts. K (issue with "settling funds"), Y (discussing letter Levison wrote to payment processor Vantiv), AJ (discussing chargebacks on DMV.com and remediation plan); PX39 (Levison Dep.) 163:1-24 (discussing Levison Dep. Ex. 19, a transcript for the company's Slack chat channel "payment-processing"), 166:16-169:14 (Levison received feedback from a broker about chargebacks and negative reviews for On Point's domains).[18]  Additionally, starting in 2013, Levison obtained at least 18 merchant processing accounts for the scheme, some of which were terminated due to excessive chargebacks.  PX11 and attachments.  In exchange, Levison received a kickback or a "productivity fee" for processing transactions through his merchant accounts and entities.  PX35 Att. B at 5; PX33 Att. Q.

Levison also managed Bella Vista Media Ltd., a subsidiary of On Point in Costa Rica that operated its call center.  PX41 at 4[19].  Levison was involved in developing the call center, PX39

---

[17] *Compare* PX41 at 5 (Levison supervised Victoria Lorido, Steven Hussey, Sara Catanzano, Karla Jinesta, and Gersom Bustos), *with* PX40 (Initial Disclosures) at 2-3 (Jinesta was "Operations Manager at BV Media," the call center (*see infra* n.19), and Hussey was "Director of Payment Solutions for On Point"), PX39 (Levison Dep.) 73:3-75:5 (Lorido was leader of the "payment solutions" team that managed merchant processing), and PX33 Att. E p. 2 (Bustos was "Product Manager, Call Center Operations" and Catanzano was "Product Manager, Billing Operations").  *See also* PX33 Att. BC at 7; PX36 (Katz Dep.) 182:8-16.

[18] *See also* PX39 (Levison Dep.) 107:17-108:11 (Levison referred to chargebacks as "CBs"), 148:14-16 (MIDs are "merchant [account] IDs"), and 155:17-156:8 (Greg Berard was one of On Point's "brokers who would help [them] fund processing"); PX36 (Katz Dep.) 198:2-199:11 (Andrew Saka was a merchant account broker for On Point, similar to Greg Berard).

Levison and his team also discussed chargeback alerts, PX39 (Levison Dep. Tr. 176:10-179:3), Visa rules for chargeback monitoring (*id.* at 179:4-180:23), and chargeback ratios (*id.* at 190:19).  *See also* PX39 (Levison Dep.) Ex. 19.

[19] Bella Vista Media or BV Media is a defendant in the *de novo* action.  Prior to January 1, 2018, Levison held a 26% interest in the company through Cardozo, his holding company.  *See* PX34 Att. I at 19-20.

(Levison Dep.) 62:7-24; supervised its managers directly, *see supra* n.17; and traveled to Costa Rica "at least once every two to three months," including with the CEO Katz, to oversee its operations, PX39 (Levison Dep.) 200:15-201:3, PX33 Atts. BX, AR.  The call center fielded consumer complaints for On Point's websites and distributed various call metrics to Katz and Levison, including refund rates.  *See, e.g.*, PX33 Att. C at 1, 35-37.  Levison discussed customer feedback with the call center team and was aware of customer complaints.  PX39 (Levison Dep.) 203:10-204:8.

Levison also assisted Katz in making contumacious misrepresentations to consumers. Specifically, Levison was the operation's counsel and admitted that he sought advice from outside counsel relating to On Point's websites, advertising, and call center scripts.  PX39 (Levison Dep.) 31:13-17, 45:18-47:2, 204:16-205:3.  Levison was also involved in testing the websites[20], and worked to create a staff of "really good content writers" for the websites.  PX39 (Levison Dep.) 62:18-63:9.

**Elisha Rothman** is a business partner Katz brought on in 2014 to operate Defendants' deceptive data monetization business.  PX36 (Katz Dep.) 95:9-13 (Katz brought in Levison and Rothman as operating partners and built the original "On Point team"); PX35 Att. AC at 2. Rothman was On Point's director of data processing, PX42 (Rothman Interrog. Resp.) at 4, and its third-largest shareholder, after Zangrillo and Katz.[21]  Rothman co-owned and co-managed several of the corporate defendants, was an "executive" of the company, discussed the company's finances with Katz, and advised him on soliciting investors.  PX42 at 4; PX38 (Rothman Dep.) 108:12-124:24 & Ex. 13; PX35 Att. AB; PX33 Atts. AV, X (Rothman on Katz's email to leadership), BS (Rothman analyzed financial performance for management forecast), BR (Rothman and Katz discussed revenue forecast); *see also id.* Atts. F, L, S, V (Rothman was included on emails discussing high chargeback rates for merchant processing companies he

---

[20] PX33 Att. CB (describing On Point's testing process, including data gathering, meetings to discuss metrics, and checks to ensure compliance with "FTC legislation").  Levison drafted various blogs on his personal website www.brentlevison.com touting his involvement in operating On Point's sites and implementing a "compliance culture" at the company.  *See, e.g.*, *id.* & Att. CA (Levison is "always speaking with counsel and getting their opinions on every aspect of [On Point's] websites"); *see also* PX39 (Levison Dep.) 214:11-215:1.

[21] Rothman held a 20% interest in the operation through his holding company Mac Media Ltd., which is a co-defendant in the FTC's *de novo* case.  PX12 Att. C p.115; PX34 Att. E at 65 (Schedule 3.1 to 2018 agreement); *see also On Point* TRO Mot. at 15.

owned).

Rothman supervised employees responsible for marketing to consumers who were deceived into providing personal information on the freemium sites.[22]  Rothman, along with his *On Point* co-defendant Christopher Sherman, expanded the deceptive freemium operation by identifying and purchasing high-value domain properties.  PX38 (Rothman Dep) 24:11-29:18, 291:9-295:3 & Exs. 40, 41.  Rothman also discussed the design and marketing of the deceptive freemium sites with Katz, Sherman, and others.  *Id*. Exs. 43, 44, 39; PX33 Atts. G, P.  Katz regularly communicated with Rothman and sought his assistance with various projects.  PX38 (Rothman Dep.) 25:8-30:1, 125:5-127:25 & Ex. 14.  Rothman also assisted Katz's effort to obscure his ownership of the consumer-facing websites by securing private mailbox rentals the websites listed as their contact information.  PX9 Atts. C, F, N.

Additionally, Rothman was heavily involved in the financial operation of the deceptive scheme and obtained bank accounts for the companies.  PX12 and attachments; PX35 Att. AB; PX38 (Rothman Dep.) 133:3-144:5.  Rothman also worked with the operation's payment processing team to analyze the company's financial performance, including, for example, the refund rates for the guide sales business.  PX38 (Rothman Dep.) 280:13-283:3 & Ex. 37.  Rothman created several entities to facilitate payment processing on the operation's deceptive guide sales sites, and he personally obtained at least seven merchant accounts for these sites.  PX11 Atts. A at 8-9; B at 5-8, 35-38, 62-65, 77-78; E at 2-3, 4-6; PX38 (Rothman Dep.) Exs. 23-28, 30.  Rothman provided personal guarantees on the merchant account applications he submitted, each of which listed a URL for a website the FTC has alleged as deceptive.  *See id.* (merchant accounts); PX38 (Rothman Dep.) 187:23-229:18 (Rothman personally guaranteed each merchant account).  Further, similar to Levison, Rothman assisted Katz's payment processing operation in exchange for a "productivity fee" payout.  *See, e.g.*, PX38 (Rothman Dep.) 203:1-204:13, 228:15-229:3; PX35 Att. B at 5; PX33 Att. Q.

Rothman also created companies that obtained advertising accounts for the deceptive sites, PX33 Att. BU, and used his corporate credit cards to pay for search-engine ads.  *See, e.g.*,

---

[22] *Compare* PX42 at 5 (Rothman supervised Lisa Vallejos), *with* PX33 Att. BZ at 1, 3 (Vallejos was an "SMS & Push Operations Manager" in the "Channel Operations" department) and PX44 at 22 (defendants' lead generation business "is commonly referred to as 'Freemiums'" and is split into two parts: "Path", which gathers data; and "Channel", which markets to consumers"); *see also* PX34 Atts. J, K, M (organizational charts showing individuals who reported to Rothman).

PX33 Att. BO at 1-2. Moreover, Rothman personally bankrolled On Point's online advertising through loans to the corporate entities. PX38 (Rothman Dep.) 147:8-150:24, 177:10-178:1 & Ex. 18; PX33 Att. AG. As Rothman wrote in a November 2019 letter to Zangrillo, "I work every day in any capacity I am needed to help us." PX38 (Rothman Dep.) 152:3-178:13 & Ex. 19. Rothman continued, "I will continue to do everything in my power to help us succeed." *Id.*

      **B.**    **New Contempt Defendants' Knowledge of the *Acquinity* Order**

Each New Contempt Defendant knew about the 2014 Order at or around the time of its entry.[23] First, Zangrillo's and Katz's sworn testimony, financial records, and other documentary evidence establish Zangrillo's knowledge of the Order in 2014. Most importantly, Zangrillo directly paid Katz's full judgment amount of $704,244 in the *Acquinity* case from his personal account to Katz's law firm's escrow account on the date the judgment was due. PX35 Att. A; Order at 4.[24] Further, after the Court entered the Order, both Katz and Zangrillo participated in at least one call with Linda Goldstein, who represented Katz in the *Acquinity* matter, regarding Katz's settlement with the FTC. PX37 (Zangrillo Dep.) 279:4-25; Order at 14 (Ms. Goldstein signed as Katz's attorney); PX35 Atts. C, E. According to Zangrillo, he spoke with Katz's counsel as part of his due diligence "to make sure that there was no pending or legal restrictions that Mr. Katz had that would prohibit him from acting in the role of CEO of DG DMV."[25] PX37

---

[23] As explained above, the FTC's First Contempt Motion did not name the New Contempt Defendants because when the FTC filed that motion, it lacked sufficient evidence of these individuals' knowledge of the 2014 Order. However, the evidence the FTC recently discovered in the *de novo* action has confirmed that in fact each of these individuals knew about the 2014 Order throughout the course of their involvement in the alleged deceptive scheme.

[24] Though Zangrillo and Katz deny that Zangrillo knew about the injunction (while admitting he knew about the "settlement"), additional evidence relating to Katz's judgment also supports Zangrillo's knowledge. The Court entered the Order on October 16, 2014 and required Katz to pay the judgment amount of $704,244 to the FTC by October 23, 2014. Order at 4. Zangrillo created DG DMV LLC on October 22, 2014, and transferred $704,244 from his personal account to Katz's law firm the next day. PX34 Att. C at 5, 8, 15; PX35 Att. A (wire record stating "PER YOUR REQUEST" in the "Details for Beneficiary field"). DG DMV, which is a defendant in the pending *de novo* and contempt proceedings, also executed several agreements with Katz on October 23, 2014, including agreements Zangrillo signed. *See supra* n.7. In June 2015, On Point Capital Partners LLC, which is Zangrillo's holding company and a defendant in the *de novo* case, assumed the loan. PX35 Att. F. Again, Zangrillo signed the loan assumption agreement.

[25] Similarly, Katz testified that Ms. Goldstein participated in a call with Zangrillo that "would have happened before 2016" and during which Zangrillo was assured that Katz's settlement was

(Zangrillo Dep.) 277:7-281:2.  Zangrillo knew that Katz had been engaged in "prior civil litigation" "around mobile billing," had a conversation with Ms. Goldstein about mobile billing, and "validated" that Katz could operate in the role [of CEO] without any restrictions." *Id*.[26]  In addition, Katz testified that he told Zangrillo that he "had a settlement," and he "believe[d]" he mentioned that the settlement was with the FTC.  PX36 (Katz Dep.) 107:22-110:6.  Emails and calendar entries also show a call between Katz, Zangrillo, and Ms. Goldstein in April 2015, shortly before DG DMV purchased DMV.com.  PX35 Atts. C, E.  Moreover, on April 16, 2021, Katz submitted a sworn statement to the FTC regarding his compliance with the 2014 Order ("April 16, 2021 Compliance Report") and represented that he "had at least one verbal communication with Mr. Zangrillo regarding settlement of a civil action at or around the time they closed on a transaction relating to DG DMV LLC."  PX45 (April 16, 2021 Compliance Report) at 2.

Second, Levison admitted during his deposition that he knew of the 2014 Order around the time it was entered.  Specifically, Levison testified that he became aware of Katz's *Acquinity* settlement shortly after the case was resolved, and he saw the 2014 Order when "it got resolved or when it got entered into."  PX39 (Levison Dep.) 236:7-239:9.  Katz's April 16, 2021 Compliance Report similarly states that he "had at least one verbal communication with Mr. Levison at or around the time of the entry of the [2014] Order regarding the substance of the Order and/or the settlement of the case."  PX45 at 2.  Additionally, Katz and Levison exchanged emails regarding the 2014 Order on "April 23, 2014; May 15, 2014; August 12, 2014; and February 9-10, 2016."  *Id*.  In one such email exchange, Levison negotiated with a law firm that represented Katz in the *Acquinity* matter regarding payment for their services, and told the firm their advice had been ineffective.  *See* PX45 Att. A at 2 (Levison writing, "the services rendered didn't equate to the amount being billed and even more there were zero results and lots of inaccurate / bad advice regarding this matter").[27]

---

"around mobile billing" and would not restrict him from "investing or working in DG DMV." PX36 (Katz Dep.) 109:16-112:14.

[26] As noted *supra*, the *Acquinity* matter involved Katz's violations of the FTC Act pertaining to unauthorized charges crammed on consumers' mobile phone bills.

[27] *See also* PX45 Att. A at 1 (attorney writing that "the invoice for the FTC matter . . . has not been paid.  A copy of that invoice is attached as Acquinity matter."); *id.* (attorney writing, "the

Third, Rothman admitted during his deposition that he knew of Katz's settlement with the FTC around the time the 2014 Order was entered.  PX38 (Rothman Dep.) 317:1-320:10. Specifically, Rothman testified that he became aware of Katz's *Acquinity* lawsuit and settlement following a conversation with Katz "around the end of 2014, beginning of 2015" at the beginning of their business relationship.  *Id*.  He further testified that while he did not recall whether Katz specifically mentioned the Order, he knew Katz had settled a lawsuit with the FTC "centered around mobile billing."  *Id*.  Katz's April 16, 2021 sworn statement similarly states that he "had at least one verbal communication with Mr. Rothman regarding the substance of the Order and/or settlement of the case at or around the time Mr. Rothman purchased an ownership interest in Cambridge Media LLC," which is a defendant in the contempt and *de novo* actions. PX45 at 2.[28]

## III.  ARGUMENT

The standard for contempt is the same as stated in the FTC's initial contempt motion. *See* First Contempt Mot. at 15.  Specifically, the movant must show by clear and convincing evidence that: (1) "the allegedly violated order was valid and lawful," (2) "the order was clear and unambiguous," and (3) "the alleged violator had the ability to comply with the order."  *FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010) (quoting *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002)); *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000).[29]  Importantly, intent is not an element of civil contempt.  *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949).  In addition, as the FTC previously noted, an order binds nonparties with "actual notice" of the order that violate the order "in active concert or

---

invoices related to the Acquinity matter[] . . . remain[s] outstanding".); *id*. at 5-7 (Acquinity bill); *id*. at 6 (describing 2014 teleconferences with "Brent" in the invoice for the Acquinity matter)].

[28] In addition, Katz testified that "generally everybody in [his] office knew about the [O]rder." "In fact," according to Katz, he "would presume that almost everyone in the industry knew about the [O]rder."  PX36 (Katz Dep.) 114:25-115:24.

[29] Once this *prima facie* showing of a violation is made, the burden then shifts to the alleged contemnor to come forward with evidence showing "categorically and in detail" why they should not be held in contempt.  *FTC v. Affordable Media*, 179 F.3d 1228, 1241 (9th Cir. 1999) (citing *United States v. Rylander*, 460 U.S. 752, 755 (1983)); *see also Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (contemnor must show that he has made "in good faith all reasonable efforts to comply") (quoting *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991)).

participation" with a named party.  Fed. R. Civ. P. 65(d)(2)(C); *Leshin*, 618 F.3d at 1232; *see also Chanel, Inc. v. Krispin*, No. 08–23439, 2010 WL 4822737, at *3 (S.D.Fla.2010) (Torres, J.); *Taser Int'l, Inc. v. Phazzer Elecs., Inc.*, No. 6:16-cv-366, 2017 WL 3584906, at *4 (M.D. Fla. July 21, 2017) ("it is clear that nonparties who assist the enjoined party in violating the injunction may be held in contempt").  For the reasons below, Zangrillo, Levison, and Rothman are bound by the Order and acted with Katz to violate it.

### A.      The New Contempt Defendants Knew of the 2014 Order.

To establish notice under Rule 65(d), "[a]ll that is required is knowledge of the mere existence of the injunction; not its precise terms."  *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1079 (E.D. Mo. 2007), *aff'd*, 580 F.3d 769 (8th Cir. 2009); *see also Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir. 1981).  Additionally, knowledge of an order can be demonstrated through circumstantial evidence "derived from the parties' relationship, concert of action in maintenance of the unlawful business, and the obvious interest of the defendants in evading any interference with their unlawful business as long as possible."  *Neiswonger*, 494 F. Supp. 2d at 1079 (citing *Hill v. United States*, 33 F.2d 489, 491 (8th Cir. 1929)); *see also United States v. Planes*, 2019 WL 3024895, at *8 (M.D. Fla. July 11, 2019) ("A party who learns about an injunction cannot 'maintain a studied ignorance of the terms of the decree in order to postpone compliance and preclude a finding of contempt.'") (quoting *Perfect Fit Indus.* & citing *Neiswonger*).[30]

As described above, sworn testimony and a plethora of corroborating evidence demonstrates New Contempt Defendants' knowledge of the Order.  *See supra* at 14-16.  Levison admitted he had notice of the Order, and indeed saw it, at the time of its entry.  Zangrillo unquestionably had knowledge of the Order when he transferred the exact amount of Katz's *Acquinity* judgment from his personal account to Katz's law firm's account on the judgement's due date.  In fact, Zangrillo admittedly investigated legal restrictions against Katz before entering into a business relationship with him, including by speaking with the attorney who negotiated and signed Katz's Order.  PX37 (Zangrillo Dep.) 278:12-279:25; PX35 Atts. C, E.  Further, Rothman and Zangrillo were admittedly aware of the *Acquinity* lawsuit, including that it

---

[30] *See also General Motors Corp. v. Gibson Chemical & Oil Corp.*, 627 F. Supp. 678, 681-82 (E.D.N.Y. 1986) ("the knowledge required of a party in contempt is knowledge of the existence of the order, . . . not knowledge of the particulars of that order").

pertained to mobile billing, and discussed Katz's settlement with him around the time of the Order's entry.  *See Neiswonger*, 494 F. Supp. 2d at 1079-80 ("The fact that [contempt defendant] may never had seen [the order] is immaterial.  He was aware of an 'order' restricting [party defendant's] participation in any future selling of financial programs, and he was aware of the FTC's action against [the party defendant].").  In addition, Katz confirmed that he "had at least one verbal communication with Mr. Rothman regarding the substance of the Order and/or settlement of the case[.]"  PX45 at 2.  This evidence is more than sufficient to show that New Contempt Defendants had notice of the Order.

> **B.      The New Contempt Defendants Violated the Order.**

As described above, Zangrillo, Levison, and Rothman worked in active concert and participation with Katz to carry out the actions that egregiously violated the Order's prohibition on making misrepresentations.  *See* Order at 3 (prohibiting "making, or assisting others in making, expressly or by implication, any false or misleading material representation").  Each of these individuals was Katz's business partner, co-owner, and played a central role in operation of the websites this Court has already described as "patently misleading."  *On Point* Prelim. Inj. at 2.[31]  Specifically, the New Contempt Defendants, along with Katz, had executive and supervisory authority over the deceptive practices, were signatories on bank accounts, and carried out important functions for the operation, such as securing merchant accounts, investments, and office space.  *See supra* section II.A.  Moreover, the New Contempt Defendants assisted Katz in concealing his deception from the FTC.[32]  In sum, New Contempt Defendants worked alongside Katz to operate the deceptive scheme and carry out acts that violate the 2014 Order.

The record shows by clear and convincing evidence that the elements of contempt are met here.  In fact, it is beyond dispute that the first two elements of contempt – a lawful and

---

[31] As discussed above and in the First Contempt Motion, Katz and the New Contempt Defendants violated the Order in two ways.  *See supra* section II.A.  First, they operated sites that falsely offered consumers state licensing or motor-vehicle services for a fee.  Second, they operated sites that falsely offered consumers assistance with eligibility determinations for public benefits in exchange for their sensitive personal information.

[32] For example, Levison and Rothman created several entities to obtain merchant processing and advertising accounts for the deceptive websites, thus shielding Katz's and his companies' involvement in the consumer-facing websites.  PX11 (merchant accounts).

unambiguous order – are satisfied here.  *See* First Contempt Mot. at 17-18 (citing *FTC v. EDebitPay LLC*, 695 F.3d 938, 943-44 (9th Cir. 2012) (holding provision prohibiting misrepresentations in the sale of any product or service specific and definite)).  Similarly, there is no question here that New Contempt Defendants had the ability to comply.  To satisfy an inability defense, New Contempt Defendants must demonstrate that they "made 'in good faith all reasonable efforts' to meet the terms of the court order [they are] seeking to avoid."  *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (per curiam) (citations omitted).  Indeed, it is insufficient to make efforts that are merely "substantial," "diligent," or in "good faith."  *Id*.  Here, New Contempt Defendants could have simply refrained from operating the misleading websites with Katz.

>        **C.      The New Contempt Defendants Are Liable for Compensatory Sanctions.**

The Court has "wide discretion" to craft a remedy for contempt.  *EEOC v. Guardian Pools, Inc*., 828 F.2d 1507, 1515 (11th Cir. 1987).  The Court's civil contempt power is measured "by the requirements of full remedial relief."  *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (quoting *McComb*, 336 U.S. at 193).  The measure of the compensatory civil contempt remedy is the amount required to reimburse the injured party for harm the contemnor caused.  *Id*.  Consumer loss is the proper measure of compensation in FTC-initiated contempt proceedings.  *See FTC v. Trudeau*, 662 F.3d 947, 950 (7th Cir. 2011); *FTC v. Kuykendall*, 371 F.3d 745, 765 (10th Cir. 2004); *McGregor*, 206 F.3d at 1388-89.  Contempt Defendants' net revenues for the two types of deceptive websites totaled $104,723,274.62, representing $87,425,519.75 in net revenues from three years of guide sales and $17,297,754.87 in revenues from one year of selling and monetizing data from the freemium websites.  PX43 ¶7; PX44 at 22-23.  The FTC therefore seeks an Order to show cause why they should not be held in civil contempt and ordered to pay a compensatory sanction in this amount.[33]

---

[33] Any monetary compensatory sanctions should be entered jointly and severally because the New Contempt Defendants acted with Katz in a unified operation to carry out the Order violations.  *Leshin*, 618 F.3d at 1237 ("Where . . .  parties join together to evade a judgment, they become jointly and severally liable for the amount of damages resulting from the contumacious conduct.") (quoting *NLRB v. AFL-CIO*, 882 F.2d 949, 955 (5th Cir. 1989)).

## IV.      CONCLUSION

Katz's business partners Zangrillo, Levison, and Rothman acted with him to violate the Order throughout its existence.  The FTC thus respectfully requests that the Court grant the FTC's motion and order Zangrillo, Levison, and Rothman to show cause why they should not be held in contempt, and ultimately require them to undo the harm they have caused to consumers.

## <u>CERTIFICATION OF COUNSEL</u>

Counsel for the FTC conferred by email and Zoom conference with counsel for all parties named in this contempt motion on April 29 and 30, 2021.  The parties named in this contempt motion oppose the relief sought.


Dated:  April 30, 2021                              Respectfully submitted,

                                                    */s/ Sana Chaudhry*
                                                    Sarah Waldrop, Special Bar No. A5502583
                                                    (202) 326-3444; swaldrop@ftc.gov
                                                    Sana Chaudhry, Special Bar No. A5502350
                                                    (202) 326-2679; schaudhry@ftc.gov
                                                    Christopher Erickson, Special Bar No. A5502434
                                                    (202) 326-3671; cerickson@ftc.gov
                                                    Federal Trade Commission
                                                    600 Pennsylvania Ave. NW, CC 9528
                                                    Washington, DC 20580
                                                    Facsimile: (202) 326-3197
                                                    Attorneys for Plaintiff, Federal Trade Commission

## CERTIFICATE OF SERVICE

I hereby certify that, on April 30, 2021, a true and correct copy of the foregoing was served via email on the following counsel:

**Counsel for Defendants Burton Katz, Brent Levison, Elisha Rothman, and Christopher Sherman:**

Robert W. Thielhelm, Jr. (rthielhelm@bakerlaw.com)
Jonathan B. New (jnew@bakerlaw.com)
Tom Donaho (tdonaho@bakerlaw.com)
Baker Hostetler
45 Rockefeller Plaza
New York, NY 10111

**Counsel for Arlene Mahon and Waltham Technologies LLC:**

Justin B. Kaplan (jkaplan@difalcofernandez.com)
DiFalco, Fernandez & Kaplan
777 Brickell Ave, Suite 630
Miami, FL 33131

Xavier A. Franco (xfranco@mcper.com)
McArdle, Perez & Franco, PL
255 Alhambra Circle, Suite 925
Coral Gables, FL 3313

**Counsel for Defendants Robert Zangrillo, Dragon Global LLC, and Dragon Global Management LLC:**

Matthew Schwartz (mlschwartz@bsfllp.com)
Sabina Mariella (smariella@bsfllp.com)
Marshall Dore Louis (mlouis@bsfllp.com)
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, NY 10001

**Counsel for Elisha Rothman:**

Solomon B. Genet (sgenet@melandrussin.com)
Joshua W. Dobin (jdobin@melandrussin.com)
Meland Russin & Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131

**Counsel for Receiver Melanie E. Damian and Corporate Defendants in *FTC v. On Point Global, LLC*, Case No. 19-cv-25046 (except Dragon Global LLC, Dragon Global Management LLC, and Waltham Technologies LLC):**

Kenneth D. Murena (kmurena@dvllp.com)
Jonathan Groth (jgroth@dvllp.com)
Damian & Valori, LLP
1000 Brickell Avenue, Suite 1020
Miami, FL 33131

*/s/ Sana Chaudhry*
Sana Chaudhry